324 So.2d 571 (1975)
Mary Alice GUILBEAU et al.
v.
LIBERTY MUTUAL INSURANCE COMPANY et al.
No. 10470.
Court of Appeal of Louisiana, First Circuit.
November 24, 1975.
Rehearing Denied January 12, 1976.
Writs Granted February 17, 1976.
*572 Joseph J. Picione, Lafayette, for plaintiffs.
Taylor, Porter, Brooks & Phillips, Robert J. Vandaworker, Baton Rouge, for Liberty Mutual Ins. Co. and Gaines P. Wilson & Son, Inc.
Porteous, Toledano, Hainkel & Johnson, Christopher E. Lawler, New Orleans, for Cottonbelt Ins. Co.
Watson, Blanche, Wilson & Posner, David W. Robinson, Baton Rouge, for Continental Ins. Co. and E. A. Caldwell, Contractor.
Before LANDRY, COVINGTON and BARNETTE, JJ.
BARNETTE, Judge.
This wrongful death and survival action arises out of an accidental death that occurred on August 11, 1971 at a construction site on U.S. Highway 190 in West Baton Rouge Parish. The decedent, John Albert Guilbeau, was fatally injured when he was struck by a backing truck owned by J. B. Higgins while walking on the shoulder of the highway in the course and scope of his employment.
At the time of the accident the shoulder of the highway was being given an asphalt overlay under a contract between the Louisiana Department of Highways and Gaines P. Wilson & Son, Inc., the contractor. The work was being done by men and equipment furnished by both Gaines P. Wilson & Son, Inc. (Wilson) and E. A. Caldwell Contractor, Inc. (Caldwell), under an agreement made by them before Wilson's bid was submitted. Before considering the liability aspect of the case, we must determine the nature of the contractual relationship between Wilson and Caldwell and the question of which one of them the decedent was actually an employee of, or if the job project was a joint venture between Caldwell and Wilson, making the decedent the employee of the joint venture.
The Continental Insurance Company and Liberty Mutual Insurance Company, the workmen's compensation insurers of Caldwell *573 and Wilson respectively, jointly paid and are paying all workmen's compensation benefits Guilbeau's dependents are entitled to under the law.
The plaintiff, Mary Alice Guilbeau, the surviving spouse of the decedent, individually and on behalf of her five minor children, is now suing for some $702,000.00, a figure which includes damages for pain and suffering to John Guilbeau prior to death, loss of support and wages, loss of love, affection, and companionship for Mary Guilbeau and each of the five minor children, and funeral expenses not paid by the compensation insurers.
Continental and Liberty Mutual intervened in this suit to recover workmen's compensation payments made in the event plaintiff is successful in establishing tort liability.
Named as defendants in this suit are Gaines P. Wilson & Sons, Inc., and its liability insurer, Liberty Mutual Insurance Company, E. A. Caldwell Construction, Inc., and The Continental Insurance Company, its liability insurer. Also named were J. B. Higgins, the owner of the 1966 Chevrolet dump truck that was involved, and his insurer, Cotton Belt Insurance Company, Inc.; the driver of the truck, Marion Lee Higgins,[1] and several others.[2]
The decedent, Guilbeau, was employed the day before the fatal accident by Tenis (sp.?) Savoy, a crew foreman in the employ of E. A. Caldwell Contractor, Inc., to work on his crew as a mechanic. Savoy's crew was primarily concerned with the operation of an asphalt spreading machine.
U.S. Highway 190 at the site of the accident is a major four lane east-west highway. The east and west bound lanes are divided by a very narrow median topped off by posts and a metal barrier rail. On each side of the highway there is an improved shoulder, level for a short distance from the road surface and then gradually sloping down. The outer lane of traffic of the two eastbound lanes was blocked to traffic by plastic cones for some distance to either side of the work area, to provide a traffic-free area in which workmen and equipment could move and work in safety.
Savoy's crew was operating an asphalt spreading machine on the shoulder of the eastbound lane moving slowly eastward toward Baton Rouge on the day of the accident. In order to keep this machine in continuous operation, it was necessary to reload the hopper every five minutes or so with hot asphalt mix from dump trucks brought in from the asphalt plant some distance up the road, which was jointly owned by Caldwell and Wilson but operated by Wilson. At the time of the accident, the trucks were coming from the east down the westbound lane and turning left through the nearest break in the barrier dividing the highway. They would cross over the eastbound lane onto the shoulder and then proceed to back westward down the shoulder to the spreader.
On August 10, the day decedent was hired, it rained and he did not work. The next day, Guilbeau reported to work. He apparently lacked certain essential tools to perform his duties as a mechanic and thus was kept busy on various miscellaneous chores. Later in the day Guilbeau was sent to Opelousas to obtain an inspection sticker for one of the Caldwell service trucks. He was also given leave by his foreman, Savoy, to buy the personal tools his job required in Opelousas. Guilbeau stopped briefly at his home, and then returned to work in the early afternoon. He was then occupied with repositioning barricades and cones on the roadway, and *574 shortly before his death, he was told to move a service truck further eastward up the road on the blocked off traffic lane to get it out of the vicinity of the spreader as it approached. It was after parking this service truck that the decedent was struck and killed as he was walking down the shoulder of the road back to the area of the spreader.
The decedent was killed almost instantly. A passing motorist was the only eyewitness to the actual striking of Guilbeau. His testimony indicates that the truck initially struck Guilbeau behind the left shoulder. There was a brief struggle, and the decedent was caught and pulled under the right rear dual wheel of the truck.
The truck that was involved in the accident was owned by J. B. Higgins and leased, along with a driver, to Gaines P. Wilson, Inc. to supplement the existing fleet of Wilson and Caldwell trucks available for the asphalting job.
We find it unnecessary to delve into the issue of negligence of the various parties. Under the facts before us in the record, as will be discussed more fully below, it is our finding that this is a joint venture and a borrowed servant situation and, under the existing law and jurisprudence, recovery in workmen's compensation is the plaintiff's exclusive remedy.
The contract with the Department of Highways was obtained by Gaines P. Wilson & Son, Inc. by the usual process of competitive bidding. Neither Caldwell nor his corporation was a party to the contract. Sometime prior to submission of a bid, E. A. Caldwell had gone to George H. Wilson, president of Gaines P. Wilson & Son, Inc., with the proposal that they bid the job together sharing equipment and participating in profits. There was an oral agreement consummated between the two and Wilson submitted a bid and was awarded the contract.
The pertinent elements of the oral agreement were as follows: Wilson was to take 4% of the gross income of the job in return for securing the construction bond, advance financing, and bookkeeping. A special account, the "Gaines P. Wilson & Son, Inc., Livonia Account," was established for the job. Initial funds for this account came from Gaines P. Wilson & Son, and thereafter deposits were to be made with the progress payments from the Department of Highways as they accrued. All expenses and salaries were to be paid out of this account. After the job was finished, the funds, if any, remaining in the account were to be shared equally as profit by the two corporations. There was to be a joint control and supervision of the project.
Both corporations also agreed to furnish equal equipment, with rental payments paid to each based on 50 to 60 per cent of the "Green Book" value. This, along with the purchase of several new pieces of major equipment necessary for the job, was to be paid as expenses from the Livonia account. In their agreement it was understood that either party could buy any of this equipment from the job after completion, or if there was any disagreement on an individual item, it would be sold to a third party with the proceeds deposited in the Livonia account.
The manpower necessary to complete the job was handled similarly. Crews previously used by both firms were utilized. These, and any other personnel required to be hired for this specific job, were to be, and subsequently were, paid by checks written on the Livonia account. The expense of supervision was also paid out of this account.
Wilson employees were to handle all clerical work except for the payroll. The payroll information was maintained in Caldwell's Baton Rouge office because Caldwell subscribed to a computer service. A computer printed the payroll checks and they were signed by a Caldwell secretary.
*575 The right to control the job was vested in both of the corporate participants. The planning of the job was carried out jointly by E. A. Caldwell and John W. Calhoun, Wilson's executive vice president. The job was executed by a superintendent, first Willie McDaniel, a Wilson employee and later, Billy Works, a Caldwell employee. McDaniel and Works alternatively supervised the Livonia project. As job superintendents they were both subject to supervision of and orders from Caldwell, Wilson and John W. Calhoun, Wilson's vice president, all three of whom took an active part in planning the project and its execution. Works was acting in the position of job superintendent at the time of the accident. Savoy, the foreman in charge of the asphalting crew, which included Guilbeau was, on the day of the accident, directly responsible to Works. The asphalt spreading machine was owned and furnished for the Livonia job by Caldwell. Savoy and his crew went with the asphalt spreader assigned to the Livonia project. The Savoy crew customarily worked together as a unit. They had worked as a crew on other jobs for Caldwell and for Wilson and for a contracting firm identified as Barber Brothers.
Clearly, as a matter of law, the above circumstances constitute a joint venture, and all employees engaged in the performance of the joint undertaking were employees of the joint venture.
Whether or not an agreement to cooperate in the execution of a particular work project constitutes a "joint venture" in the legal significance of that term is determined by the circumstances and all aspects of the agreement of the parties and not by any label which the parties themselves may place upon their agreement.
Mr. Wilson was asked specifically if he understood the term "joint venture" and testified:
"Q You used the term in your testimony, `joint venture.' Do you know what a joint venture is?
"A No, sir. I've had quite a bit of debate on that.
"Q Did you use those words as terms of art as we lawyers say, meaning a particular kind of thing or were you just talking as a layman not knowing exactly what a joint venture is?
"A I really don't know the legal term. I've had it described to me several times and frankly I don't know. I know we worked together.
"Q You have described the facts of how the Caldwell corporation and the Wilson corporation worked together and whatever kind of arrangement that was in law, you don't intend to put a label on it?
"A No, sir."
The question is the intent of the parties and that is determined by their agreement either express or implied. Hero & Company v. Farnsworth & Chambers Co., 236 La. 306, 107 So.2d 650 (1958); Daspit v. Sinclair Refining Company, 199 La. 441, 6 So.2d 341 (1942). In the Hero case the Supreme Court said:
"There are no hard and fast legal rules fixing the requisites for a joint venture; each case must be considered sui generis and care must be exercised that consideration is given to the usages and practices characteristic of the particular commercial undertaking sought to be labeled a `joint-adventure'. To satisfy the requirements by a showing that a joint profit is sought by one or more parties would be to put the `joint venture' label on almost every commercial venture requiring the cooperation of two or more parties." (Emphasis in the original) *576 Being cognizant of this admonition of caution we have looked beyond the aspect of sharing of profits and find in addition to that aspect of their agreement Caldwell and Wilson also agreed to, and did in fact, share a proprietary interest and control, and agreed to share any losses which might be incurred. These additional features of their agreement met the requirement which the Supreme Court found wanting in Hauth v. Iacoponelli, 251 La. 410, 204 So.2d 767 (1967). The facts established in this case meet all the requirements which the Courts of Appeal found wanting in Roberson v. Maris, 266 So.2d 488 (La.App.4th Cir. 1972); and in Suckle v. Hartford Accident and Indemnity Company, 163 So.2d 564 (La.App.2nd Cir. 1964), writ refused 246 La. 582, 165 So.2d 481 (1964); and in Walker v. Simmons, 155 So.2d 234 (La.App.3rd Cir. 1963).
In Babineaux v. Southeastern Drilling Corporation, 170 So.2d 518 (La.App.3rd Cir. 1965), writs refused 247 La. 613, 172 So.2d 700 (1965), the court considered the liability of the several parties to a joint venture for workmen's compensation to an injured employee. The court said:
"Where `the employee is subject to the joint control of several employers at the same time and for the same work, he is entitled, if injured, to subject them all to his compensation claim. * * * If the work being done at the time of the accident was in furtherance of a joint enterprise shared by all employers, so that each of them had a direct financial interest in the entire job, we are presented with a case of partnership or joint enterprise liability. * * * It is not necessary, that each partner or joint venturer personally control the work of the injured employee. It is sufficient that they are engaged in a common enterprise that contemplates the employment and control of the claimant by one of the interested parties for the benefit of all. * * *' Malone, Louisiana Workmen's Compensation Law (1951), Section 58, pp. 66-67."
Clearly, therefore, both Caldwell and Wilson and their respective compensation insurers are obligated for the payment of compensation in accordance with the Workmen's Compensation Law. They have recognized this obligation and are complying with the statute by making the payments according to law. It therefore follows that they have no liability to plaintiffs in this tort action. The exclusive remedy of the decedent's widow and children is in workmen's compensation benefits, as to which there is no issue. La.R.S. 23:1032. This section provides as follows:
"The rights and remedies herein granted to an employee or his dependent on account of a personal injury for which he is entitled to compensation under this Chapter shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations."
No statutory declaration could be more clear and unequivocal. There have been numerous cases in our appellate courts in which this section has been applied. In none of them has there been any question of the intent of the law. It would serve no useful purpose to burden this opinion with the numerous citations. For this reason, if for no other, the plaintiffs' demands against Caldwell and Wilson and their respective liability insurers, for damages in tort must be denied.
We will not address ourselves to the issue of liability of the defendant, J. B. Higgins, owner and lessor of the dump truck and his liability insurer, Cotton Belt Insurance Company, Inc. This issue in a similar factual situation was presented in Brown v. B & G Crane Service, Inc., 194 So.2d 746 (La.App.4th Cir. 1966), writs refused 250 La. 534, 197 So.2d 79 (1967), and 250 La. 535, 197 So.2d 80 (1967). In that case two workmen on a construction job were injured by the alleged negligence of a crane operator in causing a structural *577 steel member to break a supporting cable resulting in the collapse of structural steel frame work on which the workmen were perched. They were injured in the fall. The court there applied the "control" test and reached the conclusion that the crane operator was the borrowed servant of the general contractor and therefore the exclusive remedy of the injured workmen was in workmen's compensation. The decision in that case is dispositive of the issue here.
The dump truck which backed over and fatally injured the workman was at the time of the accident in the service of Caldwell and Wilson on the Livonia project. The truck and driver were leased to the general contractors for service on this particular job project, just as was the crane and its operator in Brown v. B & G Crane Service, supra. In this case, as in Brown v. B & G, the leased equipment (dump truck) and its operator were under the control and direction of the general contractors, their job supervisors and employees. All the truck drivers hauling asphalt mix from the asphalt plant to the asphalt spreader on the job-site were told when to haul the asphalt mix, when, where and how to dump it into the spreader hopper. The driver of the Higgins truck had to take and did take his orders from the Caldwell and Wilson employees. He was in no sense whatever under the control and direction of the owner and lessor of the truck insofar as his employment on the Livonia project was concerned. Clearly he was the borrowed servant of the general contractors, Caldwell and Wilson, and there can be no recovery of damages in tort against the owner-lessor of the truck and his liability insurer. The right of recovery in Workmen's Compensation is exclusive of all other remedies for the reason above stated. Brown v. B & G Crane Service, Inc., supra.
Our Supreme Court made an exhaustive examination of the authorities on the subject of borrowed servant in Benoit v. Hunt Tool Co., 219 La. 280, 53 So.2d 137 (1951) and found under the facts of that case that the negligent welder was not the borrowed servant of the general contractor. But in the later case of B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955), under a different set of facts found that the negligent crane operator was a borrowed servant. The test which was used in the Hooley case, as in Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App.4th Cir. 1964) and Brown when applied to the factual situation here can lead to no other conclusion than that which we have reached.
Several later cases involving the borrowed servant doctrine have been before our appellate courts. In all of them the tests adopted and applied by our Supreme Court in Hunt and Hooley were applied. Only in those where the facts failed to meet the test have the workmen been found not to be borrowed servants. Lambert v. James A. Teague Rental Equipment, Inc., 278 So.2d 544 (La.App.1st Cir. 1973) writ refused 281 So.2d 750 (La. 1973); Universal Engineers & Builders, Inc. v. Lafayette Steel Erector Corporation, 235 So.2d 612 (La.App.3rd Cir. 1970) writs refused 256 La. 854, 239 So.2d 358 (1970), and 256 La. 855, 239 So.2d 358 (1970); Kezerle v. Hardware Mutual Casualty Company, 198 So.2d 119 (La.App.3rd Cir. 1967), writ refused 250 La. 918, 199 So.2d921 (1967).
The trial judge said in his written "Reasons for Judgment:"
"The Court is of the definite opinion that deceased, John A. Guilbeau, was at least guilty of contributory negligence which was a proximate cause of the accident causing his death and therefore the plaintiff widow and heirs of decedent cannot recover. No negligence was shown by either Gaines P. Wilson and Son, Inc. or E. A. Caldwell, Inc. who were engaged in a joint venture which joint venture was the employer of decedent, Guilbeau at the time of the accident." *578 The issue of negligence as it relates to the joint venture employers, E. A. Caldwell Contractor, Inc. and Gaines P. Wilson and Son, Inc. and to J. B. Higgins, owner and lessor of the dump truck, will not be considered for the reasons above stated.
The plaintiffs seek recovery of damages in tort additionally against Marion Lee Higgins, driver of the dump truck, based on his alleged negligence. Marion Lee Higgins was not served with citation and is not before the court.
Also named as defendants and charged with negligence were Morris Brown and Alex Manuel, fellow workmen, and Billy Works, job superintendent for E. A. Caldwell Company, Inc., and "X, Y and Z officers, directors, stockholders, and all safety officers" of both E. A. Caldwell Construction Company, Inc., and Gaines P. Wilson and Sons, Inc.
We have made a careful examination of the record and fail to find where either of these named individuals was served with citation. No answers were filed in their personal behalf. No issue was joined with them and no judgment can be rendered against either of them personally. However, the plaintiffs have alleged that the respective insurers of the Caldwell and Wilson companies are liable as insurers for the negligence of these named individual employees and executive officers by reason of their coverage in the insurance policies issued respectively to the Caldwell and Wilson companies. Since the alleged liability insurers are before the court, and are alleged to be liable for the negligence of the named individuals we find it necessary to determine if there is an insurance coverage of the named individual employees and executive officers as alleged, and if so, then the issue of their liability
On careful examination of the record before us we find that certain policies of liability insurance were filed in evidence. They were issued by Liberty Mutual and Continental, respectively to the Gaines and Caldwell Companies, but they are simply automobile liability insurance policies and make no provision for coverage of any persons individually except in the use of company owned and insured automobiles. They have no application to the alleged negligence of the corporate employees and executives named in this case.
Furthermore, both defendant insurance companies expressly denied the allegations of insurance coverage of the named individual defendants and not one word of testimony was offered to contradict their denial. The plaintiffs have therefore failed to discharge this essential burden of proof, and their action against Liberty Mutual and Continental on this alleged liability must be dismissed.
It is therefore unnecessary for us to discuss the alleged negligence of the named fellow employees and executive officers, or their alleged legal liability under any theory of tort law.
We have quoted above from the trial judge's written reasons for judgment from which it appears that his reasons for denying recovery to the plaintiffs are two-fold, namely, (1) the legal relationship of the parties and (2) the decedent's contributory negligence.
For the foregoing reasons it is unnecessary for us to discuss the issue of negligence of the truck driver and the decedent's alleged contributory negligence which the trial judge found adversely to plaintiffs. We prefer to rest our judgment on the rationale discussed above rather than the issue of contributory negligence which we specifically pretermit.
The judgment rejecting the plaintiffs' demands and dismissing their suit as against all defendants is affirmed at appellant's cost.
Affirmed.
NOTES
[1] Service was not obtained on Marion Lee Higgins and consequently he is not a party to this suit.
[2] Billy Works, the alleged general supervisor of the construction, Alex Manuel, Jr., Morris Brown, fellow workmen, and X, Y and Z, officers, directors, stockholders, and/or safety officers of Wilson and Caldwell.