**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 99-30359

---

TRANSIT MANAGEMENT OF SOUTHEAST LOUISIANA, INC.; TRANSIT
MANAGEMENT OF SOUTHEAST LOUISIANA EMPLOYEE HEALTH AND WELFARE
TRUST,

Plaintiffs - Appellants

and

TENET HEALTH SYSTEMS HOSPITALS, INC., formerly known as NME
Hospitals, Inc.

Intervenor - Appellant

VERSUS

GROUP INSURANCE ADMINISTRATION, INC.; ET AL.,

Defendants

BANKERS LIFE & CASUALTY COMPANY; ATLANTA LIFE INSURANCE COMPANY;
MAXICARE LIFE AND HEALTH INSURANCE COMPANY; BANKERS LIFE &
CASUALTY COMPANY/GROUP INSURANCE ADMINISTRATION, INC., A Joint
Venture; ATLANTA LIFE INSURANCE COMPANY/GROUP INSURANCE
ADMINISTRATION, INC., A Joint Venture; MAXICARE LIFE AND HEALTH
INSURANCE COMPANY/GROUP INSURANCE ADMINISTRATION, INC., A Joint
Venture

Defendants - Appellees
--------------------------------------------------------------------
----------------------------------------------------------
WILBUR J. BABIN, JR., also known as Bill

Plaintiff-Appellant

VERSUS

BANKERS LIFE & CASUALTY COMPANY; MAXICARE LIFE AND HEALTH
INSURANCE COMPANY; ATLANTA LIFE INSURANCE COMPANY

Defendants - Appellees

1

----------------------------------------------------------------
-----------------------------------------------

WILBUR J. BABIN, JR.

Plaintiff - Appellant

VERSUS

BANKERS LIFE AND CASUALTY COMPANY; MAXICARE LIFE AND HEALTH
INSURANCE COMPANY; ATLANTA LIFE INSURANCE COMPANY

Defendants - Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

August 31, 2000

Before POLITZ, SMITH, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The principal question of Louisiana law presented by this appeal is whether the life insurance companies which provided life and stop loss insurance for an employees' health and welfare plan may be held vicariously liable to the employer, the employees' trust, and the plan's health care providers, for the third party plan administrator's wrongful misappropriation of the plan's funds, because the life insurers became joint venturers or solidary obligors with the plan administrator by virtue of the written contracts and course of dealings between the parties. The district court granted the life insurers' motions for partial summary judgment and dismissal of the plaintiffs' claims on the grounds that the insurance companies had not participated in the wrongful conduct, entered joint ventures, or otherwise subjected themselves

2

to joint or solidary liability for the plan administrator's misappropriation of funds. We affirm. The evidence educed for purposes of the motions for partial summary judgment and dismissal demonstrates that the life insurance companies did not expressly or impliedly agree to become joint venturers or solidary obligors with the plan administrator. We also dismiss for lack of appellate jurisdiction an appeal involving one insurer.

## I. Facts and Procedural History

Transit Management of Southeast Louisiana, Inc., operator of the New Orleans Transit System, and the Transit Management of Southeast Louisiana Employee Health and Welfare Trust provide health and welfare benefits to employees of the transit system. (hereinafter we refer to the employer and the employees' trust collectively as "Transit"). In May of 1988, Transit solicited proposals for the services and insurance necessary to provide the transit employees with certain health and welfare benefits. Group Insurance Administration, Inc., (GIA) and Bankers Life & Casualty Company (Bankers) submitted a joint proposal representing themselves to be partners in a joint venture (Bankers/GIA). On September 1, 1988, Transit contracted with Bankers and GIA for a health and welfare benefits plan. Under the contract, GIA was to operate as the third party administrator to administer Transit's self-insured preferred provider organization (PPO) health program, and Bankers was to provide the requisite life insurance and stop

loss insurance for the plan. Transit agreed to pay $11.90 per employee per month as an administrative services fee, $6 of which was payable to GIA and the remaining $5.90 was payable to Bankers. GIA would also receive four percent of the insurance premiums charged by Bankers.

In return for its fixed fee, GIA agreed to administer the health plan by processing medical claims and paying health care providers from a GIA bank account into which Transit would deposit funds after notification by GIA that claims had been processed. GIA also agreed to negotiate discounts with the plan's preferred providers so that Transit could offer the medical benefits at the lowest possible cost, saving an average of ten percent in medical discounts and five percent in dental discounts. Transit's medical benefits were self-insured as Transit funded their direct costs subject to the stop loss insurance coverage for claims that reached certain high levels.

GIA administered the health plan from 1988 to 1995. In September of 1991, Atlanta Life Insurance Company (Atlanta) was substituted for Bankers as the life and stop loss insurer, and in September of 1993, Maxicare Life and Health Insurance Company (Maxicare) took over from Atlanta in this capacity. Bankers, Atlanta and Maxicare each signed "joint venture" instruments with GIA.[1] Atlanta also signed an agreement to be bound by the contract

_____

[1]The Atlanta/GIA "joint venture" instrument was identical in relevant respects to that between Bankers and GIA, except that the

4

to the same extent as had been Bankers.  Maxicare did not sign an amendment to the contract, but it did forward its joint venture agreement with GIA to Transit and provided the same insurance coverage as had Bankers and Atlanta.

GIA agreed in its contract with Transit to administer Transit's PPO for a fixed monthly fee per Transit employee and to provide all services at the least possible cost to Transit and its employees.  However, GIA negotiated with hospitals and physicians for discounts ranging from fifteen to thirty-three percent and, without making disclosures  to Transit of the true discounts obtained, retained as its own profit funds representing the discounts exceeding the estimated ten percent.[2]  Transit alleges that GIA wrongfully misappropriated such funds in the amount of $4,712,024 over the life of the contract pursuant to the undisclosed discounts scheme.  Additionally,  GIA was authorized to draw upon the Transit Loss Fund Account only for the purpose of paying the processed invoices of health care providers.

---

entire $11.90 per employee administration fee was payable to GIA together with five percent of the insurance premiums earned by Atlanta.  The Maxicare/GIA joint venture instrument included the same compensation scheme but significantly reduced Maxicare's responsibilities.

[2]The contract and the joint venture instruments identify GIA as the third party administrator of the plan, but the preferred provider organization was actually administered by another corporation, GIA of Louisiana, Inc., which is now insolvent and in Chapter 7 bankruptcy proceedings in the Eastern District of Louisiana. Robert H. Carter, III, was the majority (90-95%) shareholder of both GIA and GIA of Louisiana, Inc., at the time the contract was executed.

Apparently, however, GIA paid the invoices of providers who were not in the preferred provider organization, deliberately failed to pay PPO providers, and improperly transferred funds due the PPO providers into GIA's general operating account and commingled them with its own funds. Large sums of money were transferred from this account to affiliates of GIA. As a result, many providers of health care services in the Transit benefits plan were not paid. Transit contends that approximately $665,000 of dedicated funds were improperly diverted under this scheme. Significantly, however, Transit does not contend that the insurance companies participated in GIA's wrongful conduct or scheme, had any knowledge of them, or received any benefit therefrom.

Transit filed suit in federal court (No. 96-1445) to recover funds paid to GIA under the contract and asserted claims under Louisiana state law, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. (ERISA), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (RICO). In addition to suing GIA, its holding company, and other affiliates (GIA, U.S.A., Inc.; Robert H. Carter, III and Associates, Inc.; and Robert H. Carter, III), Transit named as defendants each of the three life insurers (Bankers, Atlanta, and Maxicare) as well as each of the three purported joint ventures: Bankers/GIA; Atlanta/GIA; and Maxicare/GIA. Tenet HealthSystem Hospitals, Inc. (Tenet), as an unpaid PPO healthcare provider

6

operating several hospitals, intervened as plaintiff, adopted by reference Transit's allegations in the complaint, and argued that under Louisiana Civil Code article 1978, it was a third party beneficiary to the contracts. Tenet averred that it had provided over $225,000 of uncompensated medical services to Transit employees and their beneficiaries under the health plan.

Three other suits were consolidated with the one brought by Transit: (1) an adversary proceeding filed by Wilbur J. "Bill" Babin, Jr., Trustee in Bankruptcy, in the bankruptcy proceedings of Group Insurance Administration of Louisiana, Inc. (GIA/LA) in the United States Bankruptcy Court for the Eastern District of Louisiana (No. 96-3165),[3] (2) an adversary proceeding filed by Babin, as Trustee, against Carter, GIA/USA, and GIA of Illinois, Inc., asserting claims under the Bankruptcy Code (No. 97-1310); and (3) a separate suit by Transit against certain GIA insurers (No. 97-1736).[4]

---

[3]Babin claimed that the insurer defendants-appellees are liable to the creditors of GIA/LA for debts arising out of the administration of the Transit health plan, and he included a claim against Bankers regarding a very similar arrangement with GIA/LA relating to a purported joint venture to administer and provide insurance for a health care plan contracted with the Orleans Parish School Board (OPSB). Babin's brief on appeal concedes that his legal arguments regarding the appellees' liability are the same with respect to both the Transit and the OPSB contracts, and he adopts by reference the legal arguments advanced by Transit on appeal.

[4]Transit does not appeal the district court's grant of summary judgment to these defendants and, thus, this matter forms no part of this appeal.

The district court, on October 1, 1998, entered an Order and Reasons ruling on 17 dispositive motions. Among these rulings, the court denied Transit's motion for partial summary judgment against the three life insurers and the three alleged joint ventures on claims relating to GIA's improper retention of medical provider discounts and diversion of funds advanced on provider invoices. None of the parties asserted that ERISA preempted the state law claims. Considering the plaintiffs' claims to be Louisiana breach of contract claims, the district court found that the insurance companies had not formed any joint venture under Louisiana law and denied Transit's motion for partial summary judgment against them. The district court granted Transit's partial summary judgment motion as to GIA after concluding that GIA had breached the contract. However, the district court's ruling encompassed only a finding of liability and did not address damages. Accordingly, the district court denied GIA's motion for partial summary judgment against Transit, and it also denied as moot motions to dismiss the three purported joint ventures. Likewise, considering Transit's RICO claims against the insurers to be based solely on their alleged vicarious liability as joint venture partners of GIA, the district court granted the insurers' motions to dismiss the RICO claims.

Concluding that Babin, as Trustee of GIA/LA's bankruptcy estate, could only prevail against the life insurers if they had

8

formed true joint ventures with GIA, the district court granted motions to dismiss under Rule 12(c), brought by Bankers and Atlanta regarding Babin's claims against them.

At this point, Transit and Bankers entered a settlement. Transit moved again for partial summary judgment against Atlanta and Maxicare – this time seeking to impose joint or solidary liability on them based directly on their express and implied contracts rather than as joint venturers with GIA. Babin filed a similar motion against all three life insurers. On December 12, 1998, the district court denied these motions based primarily on that court's previous conclusion that no party had ever represented that the insurance companies would share responsibility for GIA's administration of the health plan. The district court granted Atlanta and Maxicare's motions for summary judgment rejecting the claims of Transit and Tenet. Bankers, however, did not file such a motion with respect to Tenet's claims. Finally, the district court dismissed Babin's claims against the life insurers.

Transit, Tenet, and Babin each filed a timely notice of appeal from the Federal Rule of Civil Procedure 54(b) final judgment.[5] Although the district court, by a minute entry on February 26, 1999, ordered that Tenet's claims against Bankers be dismissed,

---

[5]GIA, GIA/USA, Carter, and Carter Associates are now in bankruptcy proceedings in the Northern District of Illinois, and the claims against them have been stayed. As a result, this appeal does not include any claims against these parties.

the Rule 54(b) final judgment entered on March 2, 1999, did not explicitly dismiss those claims or incorporate by reference the minute entry.  As a result, Bankers contends that there is no final judgment on the claims and that Tenet's appeal, as to Bankers, must be dismissed for lack of appellate jurisdiction.

## II. Analysis

1.  Appellate Jurisdiction over Tenet's Claim Against Bankers.

"The courts of appeal...have jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  Typically an order is final only when it "'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" Nagle v. Lee, 807 F.2d 435, 438 (5th Cir. 1987) (citing and quoting Catlin v. United States, 324 U.S. 229, 233 (1945)).  Where, as here, an action involves multiple parties, a disposition of the action as to only some of the parties does not result in a final appealable order absent a certification by the district court under Federal Rule of Civil Procedure 54(b).[6]  See

---

[6]Fed.R.Civ.P. 54(b) provides:
> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.  In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action

10

_id_. (citing <u>Thompson v. Betts</u>, 754 F.2d 1243, 1245 (5th Cir. 1985); <u>Arango v. Guzman Travel Advisors Corp</u>., 621 F.2d 1371, 1374 (5th Cir. 1980)).

In pertinent part, Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure provides that a notice of appeal "must be filed with the district clerk within 30 days after the judgment or order appealed from is entered." Rule 4(a)(7) makes clear that "[a] judgment or order is entered within the meaning of this Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure." Rule 58 requires, _inter alia_, that "[e]very judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)." Fed.R.Civ.P. 58 (in pertinent part). In turn, Rule 79(a) requires that all judgments and orders be entered on the civil docket kept by the clerk of the district court. <u>See</u> Fed.R.Civ.P. 79(a). "The import of these appellate and civil procedure rules, taken together, is that to be appealable, any decree or order must be set forth in a separate document and entered on the clerk's civil docket." <u>Theriot v. ASW Well Service, Inc</u>., 951 F.2d 84, 87 (5th Cir. 1992).

In this case, as Tenet concedes, the March 2, 1999, Rule 54(b)

---

as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

11

final order expressly dismissed Tenet's claims against Atlanta and Maxicare and did not address Tenet's claims against Bankers. Tenet nevertheless maintains that we enjoy appellate jurisdiction over its claims against Bankers because a previous minute entry dated February 26, 1999, had ordered the dismissal of those claims, thereby signifying the district court's intention to include that dismissal within its subsequent Rule 54(b) determination and certification. Tenet errs in three respects. First, when, as here, "the record clearly indicates that the district court failed to adjudicate the rights and liabilities of all parties, the order is not and cannot be presumed to be final, irrespective of the district court's intent." Witherspoon v. White, 111 F.3d 399, 402 (5th Cir. 1997)(citing Patchick v. Kensington Publishing Corp., 743 F.2d 675, 677 (9th Cir.1984). Accordingly, as to Bankers there is not yet a final judgment dismissing Tenet's claims. Second, the district court's failure to explicitly include those claims within the Rule 54(b) final judgment, even if accidental, operates to preclude a final appealable order under 28 U.S.C. § 1291 since, as to those claims, there has been no express certification by the district court. See Lee, 807 F.2d at 438.[7] Finally, "[a] minute

---

[7]Because Rule 54(b) certification is jurisdictional, an appeal from a judgment that does not address an intervenor's claim resolves less than all of the claims asserted and without the certification, the appeal must be dismissed. See Borne v. A & P Boat Rentals No. 4, Inc., 755 F.2d 1131, 1133 (5th Cir. 1985); see also Mathews v. Ashland Chem., Inc., 703 F.2d 921, 922 (5th Cir. 1983) (appeal dismissed as premature where the judgment dismissing

12

entry, although it is a record of the court's final decision in a case or of an appealable interlocutory decision, cannot constitute a 'separate document' for the purposes of meeting the Rule 58 requirement."  Theriot, 951 F.2d at 87 (citing Jones v. Celotex Corp., 857 F.2d 273, 275 (5th Cir. 1988)).[8]  Accordingly, we dismiss as premature this appeal taken from the district court's minute entry order dismissing Tenet's claims against Bankers.

2.  Insurers' Liability.

The appellants base their claims against the appellee life insurers on three alternate grounds: (1) each life insurer, as a joint venturer with GIA, is liable for its virile share of the

plaintiff's claim against one of multiple defendants was not entered with the certification required by Rule 54(b)); 10 Charles Alan Wright et. al., Federal Practice and Procedure § 2660 (3d ed. 1998).  As the Rule 54(b) final judgment did not encompass Tenet's claims against Bankers, we cannot conclude that the certification therein vests jurisdiction in this court to review those claims.

[8]While, unlike Rule 54(b) certification, the separate document requirement of Rule 58 is not jurisdictional and may be waived, see Cook v. Powell Buick, Inc., 155 F.3d 758, 761 n.8 (5th Cir. 1998) (citing Barnhardt Marine Ins. v. New England Int'l Sur. of America, 961 F.2d 529 (5th Cir. 1992)), in this case we cannot conclude that Bankers has waived the requirement since, while acknowledging the minute entry dismissal, it premised its motion to dismiss this appeal on the Rule 54(b) final judgment's failure to expressly dismiss Tenet's claims against Bankers.  See Theriot, 951 F.2d at 88 ("[U]nder [Bankers Trust Co. v. Mallis, 435 U.S. 381, 385 n.6 (1978) ([per curiam] a decision may be appealed without the benefit of a separate document if, but only if, the district court and the parties, without objection, intended that the ruling be a final decision."); Hanson v. Town of Flower Mound, 679 F.2d 497, 501 (5th Cir. 1982) ("We conclude that we are free to hold that we may take jurisdiction of an appeal from a 'final decision under [28 U.S.C.] § 1291, even though no separate judgment has been entered, when the parties fail to raise the issue.") (citations omitted).

damages caused by GIA, according to the principles of Louisiana partnership law; or (2) if not a joint venturer in fact, each life insurer, by virtue of Transit's justified detrimental reliance upon the life insurers' representations of the existence of a joint venture, is estopped to deny the formation of such a juridical entity; and (3) each life insurer is jointly or solidarily liable for the damage caused by GIA because of the obligations assumed directly in the contracts.

a) Standard of Review.

"We review a grant of summary judgment de novo, applying the same standard as the district court." Kapche v. City of San Antonio, 176 F.3d 840, 842 (5th Cir. 1999) (citing Melton v. Teachers Ins. & Annuity Ass'n of America, 114 F.3d 557, 559 (5th Cir.1997)). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and shows that the moving party is entitled to judgment as a matter of law." Id. (citing River Prod. Co., Inc. v. Baker Hughes Prod. Tools, Inc., 98 F.3d 857, 859 (5th Cir.1996) (in turn citing Fed.R.Civ.P. 56(c)).

b) Joint Venture and Joint Venture By Estoppel.

Under Louisiana jurisprudence the fundamental elements of a joint venture are generally the same as those of partnership, and, accordingly, joint ventures are governed by the law of

14

partnership.[9]  See, e.g.,  Ault & Wiborg Co. of Canada v. Carson Carbon Co., 160 So. 298, 300 (La. 1935); Kelly v. Boh Bros. Constr. Co., Inc., 694 So.2d 463, 468 (La.App. 5th Cir.), writ denied, 700 So.2d 507 (La. 1997), and writ denied, 700 So.2d 509 (La. 1997); Cajun Elec. Power Coop., Inc. v. McNamara, 452 So.2d 212, 215 (La.App. 1st Cir.), writ denied, 458 So.2d 123 (La. 1984); Marine Services, Inc. v. A-1 Industries, 355 So.2d 625,627 (La.App. 4th Cir. 1978); see also 7 Glenn G. Morris & Wendell H. Holmes, Louisiana Civil Law Treatise: Business Organizations § 109 and n.2 (1999).

"A partnership as principal obligor is primarily liable for its debts.  A partner is bound for his virile share of the debts of the partnership but may plead discussion of the assets of the partnership."  La. Civ. Code art. 2817.[10]  However, neither the

_____

[9]"The principal difference between a partnership and a joint venture is that while a partnership is ordinarily formed for the transaction of a general business of a particular kind, a joint venture is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years."  Riddle v. Simmons, 589 So.2d 89, 92 (La.App. 2nd Cir. 1991).

[10]To the extent that Babin, as Trustee, has asserted claims belonging to the estate and that are not personal to its creditors, he has standing to pursue this appeal.  See Schimmelpenninck v. Byrne, 183 F.3d 347, 359 (5th Cir. 1999)(claims of generalized injury to the debtor's estate ultimately affecting all creditors). However, his claims against the insurers fail on their merits since GIA/LA actively devised and executed the wrongful schemes without the knowledge or participation of the insurers.  This is true whether the insurers would otherwise be liable for their virile share of the losses under partnership law, see La. Civ. Code art. 2809, or solidarily liable for the losses under the law of

15

"Joint Venture Agreement" label nor its reference to GIA and the insurers as "partners" is dispositive of the inquiry into whether or not the appellees were joint venturers. "[T]he legal relationship of parties will not be conclusively controlled by the terms which the parties use to designate their relationship, especially with regard to third parties. Courts look to the totality of evidence and not just to the written agreement between the parties to determine whether a joint venture was entered into." Cajun Elec. Power Coop., Inc., 452 So.2d at 216 (citing Guilbeau v. Liberty Mut. Ins. Co., 324 So.2d 571 (La.App. 1st Cir. 1975)); see also Morris & Holmes, supra, at § 112 ("Despite the rule that the existence of a partnership depends on the intention of the parties, it is also well established, perhaps to a fault, that the label attached by the parties to their relationship will not control whether it is to be treated, legally, as a partnership."). Rather, "[a] partnership is a juridical person, distinct from its partners, created by contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit." La. Civ. Code art. 2801.[11]    While this article reflects the 1980

_____

conventional obligations, see La. Civ. Code art. 1800.  In short, GIA/LA cannot hold liable the insurers for their alleged failure to implement procedures to safeguard against GIA/LA's wrongful conduct.

[11]The Louisiana First Circuit developed the following seven element test following requisites of article 2801:

16

revision to the partnership title of the Civil Code, it generally accords with the three-element partnership test set forth by the Louisiana Supreme Court in <u>Darden v. Cox</u>, 123 So.2d 68 (La. 1960):

> First, the parties must have mutually consented to form a partnership and to participate in the profits which may accrue from property, skill, or industry, furnished to the business in determined proportions by them. Secondly, all parties must share in the losses as well as the profits of the venture. Thirdly, the property or stock of the enterprise must form a community of goods in which each party has a proprietary interest.

<u>Id</u>. at 71 (citations omitted). Indeed, the "overwhelming majority of the partnership formation decisions reported since 1960 have recited some version of the <u>Darden</u> test." Morris & Holmes, <u>supra</u>, at § 106 (citing authorities). Typical of such recitations is <u>Riddle v. Simmons</u>, 589 So.2d 89, 92 (La.App. 2nd Cir. 1991): "There must be a sharing of profits and losses with each party having some right of control over the business."

---

(1) A contract between two or more parties;

(2) A juridical entity or person is established;

(3) Contribution by all parties of either efforts or resources;

(4) The contribution must be in determinate proportions;

(5) There must be joint effort;

(6) There must be mutual risk vis-a-vis losses;

(7) There must be a sharing of profits.

<u>Cajun Elec. Power Coop., Inc</u>., 452 So.2d at 215; <u>see</u> <u>also</u> <u>Rester v. Aetna Cas. and Sur. Co.</u>, 598 So.2d 673, 676 (La.App. 3rd Cir. 1992) (same).

17

While Louisiana law at least nominally recognizes the possibility that a person may be estopped to deny the existence of a partnership that he has represented to exist when he holds himself out as a partner to the justified detrimental reliance of a third party, Louisiana courts have refused to apply the estoppel theory where the alleged partners have not shared in the profits and losses of a common enterprise.[12]  See Gravois v. New England Ins. Co., 553 So.2d 1034, 1039 (La.App. 4th Cir. 1989) ("even in [partnership by estoppel] cases, the intent to share profits and losses is an indispensable element."); Butler v. Atwood, 420 So.2d 742, 747 (La.App. 4th Cir. 1982) (same); see also Morris & Holmes, supra, at § 1.10.

Applying these principles, we conclude that, because GIA did not agree to share profits and losses with any of the life insurers related to any of the contracts between them, none of the life insurers became a joint venturer with GIA either by agreement or estoppel.  The contract consisted of five separate documents

---

[12]The latest case to so hold was reversed summarily by the Louisiana Supreme Court, see Hartwick v. Hartley, 598 So.2d 1241, 1242 (La.App. 4th Cir.), rev., 604 So.2d 957 (1992)( "Judgment of the court of appeal is reversed.  There is a genuine issue of material fact. Motion for summary judgment denied. Case remanded to the district court for further proceedings.").  Thus, while the concurring opinion in the court of appeal would have premised application of the estoppel theory only on justified detrimental reliance upon representations of the existence of a partnership, see Hartwick, 598 So.2d at 1243-44, this approach has yet to be applied in a majority decision and does not represent current Louisiana jurisprudence.  See Morris & Holmes, supra, at § 1.10.

totaling 400 pages.  It incorporated by reference the instruments designated "Joint Venture Agreement," which were sequentially entered into by Bankers and Atlanta with GIA.  As noted previously, Bankers was a signatory to the contract, Atlanta signed a letter agreement substituting itself as the life insurer under the contract, and Maxicare forwarded to Transit a copy of its "joint venture agreement."  Each "joint venture agreement" explicitly provided for the distribution of the monthly per employee fee of $11.90 to be paid by Transit (GIA $6.00, Bankers $5.90; GIA $11.90, Atlanta $0; GIA $11.90, Maxicare $0) and for the insurance premiums to be paid to the life insurers with GIA receiving a four percent brokerage fee from Bankers and a five percent brokerage fee from Atlanta and Maxicare.  Under these agreements, GIA would provide all PPO and administrative services, and the life insurers would provide life and stop loss insurance coverage at specified rates.  Thus it was entirely possible that GIA could have profited while the insurers lost money, or vice versa.  In sum, there was no agreement to share in profits or losses, and no evidence was adduced that profits and losses were actually shared.

The present case is analogous to Payton v. Aetna Life and Cas. Co., 299 So.2d 489 (La.App. 4th Cir.), writ. denied, 302 So.2d 617 (La. 1974).  In Payton, the Louisiana Fourth Circuit considered whether a roofing contractor and a sheet metal contractor formed a

19

joint venture to perform a construction contract entered into with a general contractor. See id. at 492. The roofing contractor was injured while working on a job on which he had jointly bid with the sheet metal contractor, and the sheet metal contractor sought to avoid paying worker's compensation by arguing that the injured party was a joint venturer and not its employee or subcontractor. See id. at 492-93. The court held:

> Nevertheless, we cannot conclude that the relationship between [the sheet metal contractor] and [the roofing contractor] constituted a partnership or joint venture. They did not agree to share profits or losses, but simply agreed that each would perform a specific portion of the contract at a fixed remuneration to each party. Apparently, if [the roofing contractor's] cost of roofing materials increased, this cost would come out of his portion of the calculated contract price; and if [the sheet metal contractor's] cost of sheet metal decreased, [he] would receive the entire windfall.
>
> Thus, it was possible that [the roofing contractor] could lose money on the venture, while [the sheet metal contractor] made a profit. This is contrary to the essence of a partnership, which contemplates that all partners will lose or all partners will profit [, and it] is fatal to [the sheet metal contractor's] contention of the existence of a partnership.

Id. at 493-94.

We agree with and adopt the district court's well-stated conclusions: "There is no indication in the contracts or indeed from the facts of this case that this endeavor was truly a 'common

20

endeavor' with a common sharing of risks. Each party had completely separate functions with separate risks: GIA administered the Plan and the insurance companies provided insurance coverage for the plan. The insurance companies earned premiums, and GIA earned the service fee, as such the funds were not paid to the alleged joint venture but to GIA and the respective insurer separately. For instance, GIA paid nothing and risked nothing with respect to the insurance companies' provision of stop-loss coverage for medical insurance or life insurance." The district court likewise concluded that under Gravois v. New England Ins. Co., 553 So.2d at 1039, as there was no intent to share profits and losses, an indispensable element of joint venture by estoppel was lacking.

For the foregoing reasons, under Louisiana law GIA and the life insurers were not joint venturers and the life insurers are not estopped to deny the existence of joint ventures.

c) Joint or Solidary Liability Provided by the Contract.

Multiple obligations contained within a single agreement or contract may be solidary, joint, or several. See La. Civ. Code art. 1786. "An obligation is solidary for the obligors when each obligor is liable for the whole performance." La. Civ. Code art. 1794 (in pertinent part); see also Narcise v. Illinois Central R.R. Co., 427 So.2d 1192, 1194 (La. 1983) ("Coextensive obligations for the 'same thing' create the solidarity of the obligations."). However, solidary liability is never presumed; "[a] solidary

21

obligation arises from a clear expression of the parties' intent or from the law." La. Civ. Code art. 1796. As the contracts herein at issue contain no such clear expression of intent, liability is only solidary for the insurers if they were liable on the contract, along with GIA, for the whole performance as a matter of law.

The ultimate test of whether an obligor may be held for the whole or for only a proportionate part of the obligation is essentially whether the two obligors each promised the same or full performance or whether each promised only a different performance, that is to pay a proportionate part of the liability. Wilks v. Allstate Insurance Company, La.App., 195 So.2d 390; 4 Corbin on Contracts, sec. 925. When several persons obligate themselves to the obligee by the terms 'in solido' or use any other expressions which clearly show that they intend that each one shall be separately bound to perform the whole of the obligation it is called an obligation in solido on the part of the obligors. Wilks v. Allstate Insurance Company, supra; LSA-C.C. art. 2082.

Several obligations are produced when what was promised by one of the obligors is not promised by the other, but each one promises separately for himself to do a distinct act; such obligations, although they may be contained in the same contract, are considered as much individual and distinct as if they had been in different contracts and made at different times. LSA-C.C. art. 2087. Nothing more is effected by such contracts than if each one of the obligors had entered into separate and distinct contracts and the relationship between the parties is kept as separate and distinct as if each had made a different contract for himself on a different

22

date.

<u>Flintkote Co. v. Thomas</u>, 223 So.2d 676, 678 (La.App. 4th Cir. 1969).

Additionally, joint liability obtains when the obligors are obligated for the same performance, but none is bound for the whole. <u>See</u> La. Civ. Code art. 1788 ("When different obligors owe together just one performance to one obligee, but neither is bound for the whole, the obligation is joint for the obligors.").

Appellants rely primarily upon <u>Payton</u>, 299 So.2d at 494, in which the court held that, while the roofing subcontractor and a sheet-metal contractor were not joint venturers, they were solidarily liable on a construction contract. In <u>Payton</u>, all sheet metal and roofing work was to be provided for one set price, the contractor made all checks payable to both subcontractors, and each subcontractor intended that they not be paid unless both portions of the contract were performed satisfactorily; thus it was immaterial that as between themselves the subcontractors agreed to perform only specified portions of the contract. <u>See</u> <u>id</u>. at 492-94. In short, each party was obligated for the entire performance due under the contract. <u>See</u> <u>id</u>. at 494. In contrast, in the present case, each of the "joint venture agreements" delineated the separate responsibilities assumed by the life insurers and GIA in satisfying all of the contractual obligations owed to Transit.

Assuming *arguendo* that, as contended by appellants, the "joint venture instruments" between GIA and Bankers, Atlanta, and Maxicare

23

were each incorporated into the contracts with Transit, none of the instruments requires that the whole, or even the same part, of the obligations due to Transit and its employees be performed by either GIA or the insurer. The GIA/Bankers "joint venture agreement" contained a "statement of work" which assigned 22 duties to Bankers, all of which were related to the provision of the requisite life and stop loss insurance coverage, whereas GIA assumed 41 duties, including, among other things, providing all required PPO administrative services. The GIA/Atlanta "joint venture agreement" contained a "statement of work" wherein eighteen duties were assigned to the insurer regarding insurance coverage and related matters, and a different forty-two duties were assigned to GIA, including providing PPO services. Finally, the GIA/Maxicare "joint venture agreement" listed only three duties for Maxicare, all related solely to insurance coverage.[13] On the other hand, this agreement assigned forty-two duties to GIA related to its role as third party administrator of the PPO.

Under the contracts, the life insurers were not obligated to perform the administrative services required of GIA, and GIA was not required to provide the requisite insurance coverage.

---

[13]The duties were to: (1) provide actuarial services; (2) provide fully insured coverage to Transit members including group life, accidental death and dismemberment, medical conversion, and stop loss policies; and (3) provide group life certificates and all insurance forms for use in administering the life and accidental death and dismemberment programs.

24

Accordingly, as the insurers were obligated to provide certain insurance coverage for a certain amount of money in premiums and GIA was obligated to perform totally separate administrative services for a certain amount of money, each to be paid directly by Transit even if the other failed to perform, and because neither was obligated to perform the obligations of the other, liability for the respective obligations of the insurers and GIA is several rather than solidary. See La. Civ. Code art. 1787 ("When each of different obligors owes a separate performance to one obligee, the obligation is several for the obligors. . . . A several obligation produces the same effects as a separate obligation owed . . . by each obligor to an obligee").

Thus, our conclusion that the insurers and GIA were not each obligated to render the whole performance due to Transit forecloses joint liability and solidary liability, and instead mandates several liability. Because it is not alleged or argued that the life insurers participated, aided, or abetted GIA in its breach of the contract, they cannot be held liable for the wrongful misappropriation of funds by GIA which related exclusively to GIA's duties to provide all PPO administrative services, including the payment of claims, at the least possible cost to Transit. Accordingly, we conclude that the district court did not err in granting the life insurers' motions for partial summary judgment and dismissal of the solidary liability claims.

## III. Conclusion

For the foregoing reasons, the appeal of Tenet as to its claims against Bankers is DISMISSED AS PREMATURE, and the judgments of the district court included in its Rule 54(b) final judgment are AFFIRMED.