ROLAND L. BELSOME, Judge.
| iAppellant, Sutterfield <& Webb, LLC, appeals the trial court’s order allocating a contingency fee between Appellant and attorney Gordon P. Serou, Jr. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY

Chimneywood Homeowners Association, Inc., the original plaintiff, hired John Ryan in December 2005 to assert a claim on its behalf against Eagan Insurance Agency and other Defendants.[1] The retainer *1144 agreement between Chimneywood and Mr. Ryan provided that Chimneywood would pay Mr. Ryan $75.00 per hour in addition to a 20% contingency fee.
In September 2006, with Chimneywood’s consent, Mr. Ryan also engaged Sutter-field & Webb, L.L.C. (“S & W”) to assist with the claim. Gordon Serou, a former law partner of Mr. Ryan, was a salaried attorney at S & W. While he was an attorney at S & W, Mr. Serou represented Chimneywood with Mr. Ryan from September 2006 until July 2007. An agreement between S & W and Chimneywood provided that S & W would work on the case with Mr. Ryan for an hourly rate of | ¾$75.00, and an agreement between S & W and Mr. Ryan provided that S & W would receive 40% of Mr. Ryan’s 20% contingency fee.
On July 13, 2007, Mr. Serou resigned from S & W. Mr. Ryan subsequently contacted James Sutterfield, a senior partner at S & W, regarding a transfer of the Chimneywood file to Mr. Serou. Mr. Sut-terfield requested a directive from Chim-neywood before transferring the file. On July 31, 2007, Debbie Gordon, president of Chimneywood,[2] provided an email directive authorizing the transfer of the Chimney-wood file to Mr. Serou at his new firm.[3]
From that point forward, Mr. Serou represented Chimneywood with Mr. Ryan. Mr. Serou was paid $75.00 per hour by Chimneywood, and Mr. Ryan advised Chimneywood that Mr. Serou would receive 40% of Mr. Ryan’s 20% contingency fee.[4] After Mr. Serou resigned, he acknowledged in email correspondence to Mr. Sutterfield that S & W had an interest in the contingency fee.[5]
|o!n May 2008, the matter settled for $1,250,000.00, with a resulting 20% contingency fee of $250,000.00. The settlement check was made out to “John H. Ryan & Gordon P. Serou Jr. Attys & Chimney-wood Homeowners Association Inc.”[6] S & *1145 W consented to the disbursement of 60% of the $250,000.00 fee, or $150,000.00, to Mr. Ryan. The remaining 40% of the fee amounted to $100,000.00.
After S & W filed a Petition of Intervention [7] to assert rights regarding its alleged share of the contingency fee, Mr. Ryan, Mr. Serou, and Scott Winstead of S & W filed a Joint Motion and Order to Deposit Funds into the Registry of the Court Pending Resolution of Attorneys’ Fee Dispute. The court granted the motion on June 27, 2008, and Mr. Ryan subsequently deposited the $100,000.00 in disputed funds into the registry of the court.
On June 20, 2008, all parties agreed to dismiss the underlying litigation against Eagan and the other Defendants with prejudice, and a Joint Motion and LJudgment of Dismissal, was signed on that date. After the case was dismissed, Mr. Serou filed a Motion to Withdraw Attorney’s Fee from the Registry of the Court, asserting that he and other attorneys at S & W worked a total of 99.2 hours on the case before resigning, and that after his resignation from S & W, Mr. Serou and his associate at The Law Offices of Gordon P. Serou, Jr., L.L.C., worked for a total of 150.2 hours on the case. He calculated that of the total 249.4 hours, he worked 60.22453% of the hours while employed at his new law practice, and 39.77546% of the hours while employed through S & W. Accordingly, Mr. Serou maintained that he should be awarded $60,224.53 of the $100,000.00 in disputed funds.
S & W filed a Motion to Strike, and in the alternative, an Exception of No Right of Action. S & W also filed its own'Motion to Withdraw Funds From the Registry. In the motion, S & W argued that Mr. Serou and The Law Offices of Gordon P. Serou, Jr., L.L.C. were not parties to the action and that Mr. Serou’s motion to withdraw should be stricken; and that Mr. Serou and his new practice had no right of action to recover funds from the registry of the court, nor any interest in the suit. 5 & W further argued that it was entitled to the entire $100,000.00 fee remaining in the registry of the court, while Mr. Serou had no right to any portion of the fee. S 6 W served a copy of the motion to Mr. Serou.
In October 2008, the trial court denied S & W’s motion to strike and exceptions, but *1146 made no ruling with respect to the other pending motions. S & W subsequently-filed a Motion for Leave to File Supervisory Writ Application and to Stay Further Proceedings Pending the Supervisory Writ. The trial court granted leave to file the writ, but denied S & W’s request for a stay of the proceedings. S & W filed supervisory writ 2008-C-1358, seeking relief from the court’s denial of the request for a stay. The writ was denied by this Court on November 3, 2008. | ¡/Thereafter, on November 21, 2008, S & W filed writ application 2008-C-1439, regarding the court’s denial of its motion to strike and exceptions. This supervisory writ application was also denied by this Court.
Trial in the matter was held August 10, 2009. At trial, Gordon Serou, John Ryan, Debbie. Gordon, Max Cohen,[8] and James Sutterfield testified. After taking- the matter under advisement, the trial court awarded 50% of the proceeds in the registry to S & W and the other 50% to Gordon Serou. This appeal followed.
STANDARD OF REVIEW
Factual determinations are subject to the manifest error standard of review. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Likewise, mixed questions of law and fact are also reviewed under the manifestly erroneous standard of review. CII Carbon, L.L.C. v. Nat’l Union Fire Ins. Co. of Louisiana, Inc., 2005-0071 (La.App. 4 Cir. 8/17/05), 918 So.2d 1060, 1065, writ denied, 2005-2408 (La.3/24/06), 925 So.2d 1235 (citing Tadlock v. Taylor, 2002-0712, p. 17 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 33, unit denied, 2003-3265 (La.3/12/04), 869 So.2d 819).
DISCUSSION
Assignment of Error # 1
Appellants first argue that the trial court erred in denying S & W’s Motion to Strike and Alternative Exception of No Right of Action. Appellants submit that Mr. Serou had no right of action and was not a proper party, as he failed to take an action to assert his right to any funds until after the case was dismissed, when he | ñfiled a Motion to Withdraw Attorney’s Fee From the Registry of the Court; thus, Mr. Serou’s intervention is precluded, and he has no legal right to proceed.
Mr. Serou submits that his status as a party to the proceedings was confirmed when S & W served him with its own motion to withdraw funds from the registry. Additionally, he contends that S & W is estopped from contending that Mr. Ser-ou could not assert a claim to the fee, because the Joint Motion and Order to Deposit Funds into the Registry of the Court was also filed after the court dismissed the action against Eagan Insurance and the other defendants. Mr. Serou further argues that he is an indispensable party to these proceedings. See Saucier v. Hayes Dairy Products, 373 So.2d 102, 119 (La.1979)(on rehearing)(citing La. C.C.P. arts. 645 and 927).[9]
*1147 We find that S & W is judicially-estopped from arguing that Mr. Serou was not a proper party to the litigation. See Miller v. Conagra, Inc., 08-0021, p. 9 (La.9/8/08), 991 So.2d 445, 452 (recognizing that “the Supreme Court of the United States has generally described judicial es-toppel as an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.”)(citing New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S.Ct. 1808, 1814-15, 149 L.Ed.2d 968 (2001)). Accordingly, the trial court properly denied S & W’s Motion to Strike and Alternative Exception of No Right of Action. This assignment of error lacks merit.
17Assignment of Error # 2
In the second assignment of error, Appellants argue that this case is a contract dispute rather a dispute regarding a legal fee, and that the trial court erred in applying Saucier. While Appellants concede that Saucier is the seminal case in Louisiana regarding fee disputes between attorneys and their clients, Appellants argue Saucier is nevertheless inapplicable to fee splitting disputes between lawyers.
In the trial court’s written reasons for judgment, • the court found that Saucier was controlling, and thus considered the following factors in making its determination: [10]
1.) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service property-
2.) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
3.) The fee customarily charged in the locality for similar legal services.
4.) The amount involved and the results obtained.
5.) The time limitations imposed by the client or by the circumstances.
6.) The nature and length of the professional relationship with the client.
7.) The experience, reputation and ability of the lawyer or lawyers performing the services.
8.) Whether the fee is fixed or contingent.
|sThe trial court “considered all of these factors, the testimony, the exhibits, including the time records and invoices submitted by each party, and f[ound] that the *1148 contingency fee of $100,000, currently on deposit in the registry of the court, shall be allocated between Gordon Serou, Esq. and Sutterfield and Webb, LLC with each being entitled to 50% of the $100,000 fee on deposit.” Appellants argue that Saucier is inapplicable to these facts, because the agreement for the portion of the contingency fee was between Mr. Ryan and S & W, not between S & W and Chimney-wood, and therefore, the, agreement between Mr. Ryan and S & W must be enforced as written. Notably, however, the language in S & W’s petition of intervention itself ostensibly triggers application of the Saucier factors, because the object of S & W’s petition of intervention is plainly Chimneywood, not Mr. Serou or Mr. Ryan.[11] See Verges v. Dimension Development Company, Inc., 2008-1336 (La.App. 4 Cir. 2/10/10), 32 So.3d 310, 317 (Murray, J., dissenting)(noting that “[i]n Saucier, the court ... recogniz[ed] the discharged attorney’s right to receive fair compensation [from the client] for work performed before being discharged.”). Furthermore, we find that Appellants’ reliance upon jurisprudence purporting to support the argument that Saucier should not be applied to these facts is misplaced.
Duer & Taylor v. Blanchard, Walker, O’Quin & Roberis, which pre-dates Saucier, involved an inquiry into whether an action by one attorney to share a fee that was collected over three years prior to the action being filed was subject to a prescriptive period of three years or ten years. Duer, 354 So.2d 192, 194 (La.1978). The Court in Warner v. Carimi Law Finn considered whether a provision of an employment contract regarding division of attorney fees paid in cases lainvolving clients that the contract attorney brought with him upon departure from the firm violated the Code of Professional Responsibility; in this case, however, a fee sharing agreement between Mr. Serou and S & W is not at issue. Warner v. Carimi Law Firm, 98-613, p. 7 (La.App. 5 Cir. 12/16/98), 725 So.2d 592, 596.
Scurto v. Siegrist, a case also relied upon by Appellants, held that an agreement regarding division of a contingency fee between two attorneys not of the same firm, but jointly representing a client, was valid and enforceable because Scurto, the retained attorney, “was actively and continually involved with the case by frequently communicating with the client, advancing all expenses he was requested to pay, researching jurisprudence and statutory law, and attending depositions on behalf of his client.” Dukes v. Matheny, 2002-0652, p. 4 (La.App. 1 Cir. 2/23/04), 878 So.2d 517, 520 (citing Scurto v. Siegrist, 598 So.2d 507, 510 (La.App. 1st Cir.1992)). The record does not evidence that in this case, S & W, the retained firm, continued to be involved with the case after transferring the Chimneywood file to Mr. Serou at his new firm, pursuant to the email directive from Debbie Gordon.
Furthermore, Debbie Gordon unequivocally testified at trial that she discharged S & W after Mr. Serou resigned from S & W.[12] Mr. Ryan similarly | ^confirmed that S *1149 & W was discharged by Chimneywood subsequent to Mr. Serou’s departure from the firm.[13] This fact is further demonstrated by the lack of evidence in the record indicating that S & W participated in the litigation of the matter until the case was resolved by settlement.[14]
In Dukes v. Matheny, the First Circuit revisited Scurto, holding that “the finding of a joint venture has been based on the fact that neither attorney has been discharged and both were actively involved in the case and remained responsible to their client.” Dukes v. Matheny, 2002-0652, p. 4 (La.App. 1 Cir. 2/23/04), 878 So.2d 517, 520. Thus, even assuming arguendo that S & W was unaware that it had been discharged by Chimneywood, there is no evidence in the record that S & W remained “actively involved in the case” subsequent to Mr. Serou’s departure. See _[nid. Therefore, “in the absence of joint representation and a written agreement with the client, if an oral agreement to divide a fee existed in this case, the fee could be divided only on a quantum meruit basis.” Dukes, p. 6, 878 So.2d at 521 (citing Rules of Professional Conduct, Rule 1.5(e)(1)); Brown v. Seimers, 98-694 (La.App. 5th Cir.1/13/99), 726 So.2d 1018, 1022; and Matter of P & E Boat Rentals, Inc., 928 F.2d 662, 665)(5th Cir.1991)(emphasis added)).[15]
*1150 Even Fox v. Heisler, also relied upon by Appellants, refers to Scurto as “a Duer situation, that is, two attorneys not of the same firm jointly representing a client.” Fox v. Heisler, 2003-1964, p. 9 (La.App. 4 Cir. 5/12/04), 874 So.2d 932, 938. In Fox, when the plaintiff attorney John Fox left defendant’s employment, he made a verbal agreement with the defendant, Frederick Heisler of Heisler & Wysocki, to share fifty percent of the attorneys’ fees in “the Chris Mann” matter, an extremely lucrative case which Mr. Fox had brought with him when he left Heisler’s employ. Fox, 2003-1694, p. 3, 874 So.2d at 934. When Mr. Fox left defendant’s firm, he took a total of 211 case files with him; at the time of trial, Mr. Fox had remitted the agreed-upon fifty percent fee “in at least 74 cases, including two prior fees collected in the Chris Mann case as partial settlements.” Id., 2003-1694, p. 3, 874 So.2d at 934-35. Mr. Fox brought a declaratory judgment action to determine the rights of each party with respect to the legal fees generated in the Mann case, and Mr. Heisler filed a motion for summary judgment alleging that fifty percent of the fees were due and payable to him. Id., 2003-1694, p. 2, 874 So.2d at 934.
112This Court concluded that the situation presented therein was “neither a suit for recovery of attorney’s fees nor a suit over the terms of the settlement agreement.” Id., 2003-1694, p. 9, 874 So.2d at 938. In affirming the trial court’s grant of summary judgment in favor of Mr. Heis-ler, this Court recognized that Mr. Heisler advanced costs to Mr. Fox; that Mr. Heis-ler kept records concerning the case; that “[wjithout [Mr. Heisler’s] involvement in the Mann case, [Mr. Fox] might have gone bankrupt and could no longer represent Client”; that Mr. Fox had faithfully adhered to the oral contract he made with Mr. Heisler for thirteen years; and that Mr. Fox and Mr. Heisler had previously agreed to split fees 50/50 on two separate occasions specifically regarding the Mann ease. Id. at p. 10. Accordingly, this Court found that the well-established oral agreement between Mr. Fox and Mr. Heisler was valid and enforceable. Id. at 939.
In contrast to the instant case, although Mr. Serou acknowledged that S & W had an interest in the fee,[16] Mr. Serou and S & W made no agreement with regard to fee splitting, and Mr. Serou and S & W did not jointly represent Chimneywood. Rather, Mr. Ryan and Mr. Serou jointly represented Chimneywood from the time of Mr. Serou’s departure from S & W until the time of settlement,[17] with Mr. Serou *1151 | ^performing virtually all of the work on the .case, both prior and subsequent to his departure from S & W.[18]
We find, as the trial court did, that Saucier is applicable to the facts of this case. In Saucier, plaintiff Fred Saucier hired attorney George Reese to represent him on a contingency basis in connection with an automobile accident that occurred on February 9, 1971. Pursuant to the agreement, Mr. Reese would receive one-third of any recovery. Mr. Reese filed suit on behalf of Mr. Saucier on January 25, 1972. On January 15, 1975, Mr. Saucier discharged Mr. Reese and hired new counsel. Mr. Reese subsequently intervened, asserting that he was entitled to one-third of any recovery. The case settled for $75,000.00.
The trial court awarded Mr. Reese $8,000.00, plus court costs and medical expenses that Mr. Reese paid on behalf of Mr. Saucier. On appeal, this Court increased the award to one-third of the total recovery, or $25,000.00.
On rehearing,[19] the Louisiana Supreme Court recognized that the Disciplinary Rules allowed for contingency fee contracts, provided that such contract does not restrict the client’s right to discharge the attorney (with or without cause) “or result in an attorney collecting a ‘clearly excessive’ fee which has not been ‘earned’ as defined by the [Disciplinary R]ules.” Saucier, 373 So.2d at 117. Likewise, the Court concluded that the Disciplinary Rules did not conflict |14with La. R.S. 37:218,[20] as “[t]he collection of excessive amounts for which no commensurate service was performed is not vouchsafed by the provisions of the statute.” Id. Thus, the Court held that only one contingency fee would be owed by the client, and “that fee should in turn be allocated between or *1152 among the various attorneys involved in handling the claim in question, such fee apportionment to be on the basis of factors which are set forth in the Code of Professional Responsibility.”[21] Id. at 118. Accordingly, the fee was to be apportioned according to the respective efforts and contributions of the attorneys for work performed, while also taking into consideration the factors articulated in the Code of Professional Responsibility.[22] Id.
11fiWe find that the trial court properly held, after consideration of the Saucier factors, that S & W was not entitled to the entirety of the remaining $100,000.00 of the contingency fee. “[E]ven with a contract, the client has a right to discharge the attorney (and terminate the contract) at any time, with or without cause, subject to liability for payment for reasonable attorney’s fees.” Francis v. Hotard, 2000-0302 (La.App. 1 Cir. 3/30/01), 798 So.2d 982, 985, writ not considered, 2001-1323 (La.6/22/01), 793 So.2d 1263 (citing Scott v. Kemper Insurance Company, 377 So.2d 66, 70 (La.1979) and Gravity Drainage Dist. No. 2 v. Edwards, 207 La. 1, 20 So.2d 405, 406 (1944)); see also Saucier, supra, at 107 (Tate, Justice, dissenting)(“Upon termination, the attorney is entitled to recover only the value of his services, not the original contingent fee under the contract, which contemplated that he perform the full and entire services leading to the settlement rather than only part of them.”).
Under these particular facts and circumstances, the trial court correctly determined that the remainder of the contingency fee should be disbursed “according to the respective services, and contributions of the attorneys for work performed and other relevant factors.” Saucier, 373 So.2d at 118. Had the entire contingency fee been deposited in the court’s registry, S & W’s arguments might be more persuasive; however, S & W and Mr. Serou inexplicably consented to the release of 60% of the funds to Mr. Ryan, leaving S & W to contest the remaining 40% with Mr. *1153 Serou, despite the fact that both Mr. Serou and S & W had | ^agreements with Mr. Ryan to receive 40% of the contingency fee.[23] Accordingly, we cannot say that the trial court’s factual finding that S & W and Mr. Serou were each entitled to fifty percent of the remaining fee is manifestly erroneous or clearly wrong.
CONCLUSION
For the foregoing reasons, the trial court’s judgment is hereby affirmed.
AFFIRMED.

. Chimneywood asserted that Eagan Insurance Agency, Inc., purchased the incorrect flood insurance coverage for its property, and that consequently, Chimneywood did not have *1144 full coverage for losses sustained during Hurricane Katrina.

. At the time of trial, Ms. Gordon was no longer president of Chimneywood.

. John Ryan forwarded the email directive from Debbie Gordon to Jim Sutterfield the same day, requesting that Mr. Sutterfield "[pjlease forward the [Chimneywood] files to Gordon without delay.” Mr. Sutterfield responded the same day, and wrote the following:
John,
Will do- — I understand that [Mr. Serou] is coming here in the morning to pick up some furniture and [the Chimneywood files] will be on his desk when he does so.
Jim

. This agreement is evidenced by email correspondence dated January 22, 2008, from Mr. Ryan to Debbie Gordon in which Mr. Ryan stated:
Debbie:
Legal ethical requirements require that I obtain your agreement when I agree to split a legal fee with another lawyer.
Part of the fee in the suit against Eagan is contingent, that is, it is subject to obtaining a recovery from Eagan. The fee is 20% of the recovery. Gordon Serou and I have agreed to split this fee as follows: 12% to me and 8% to Gordon. Please confirm your agreement with this arrangement. Thank you.
Debbie Gordon responded to the email the same day with the reply, "Yes I agree to this.”

. On July 20, 2007, Mr. Serou sent the following e-mail correspondence to James Sutter-field:
Jim — Thank you.
You have an interest in the contingency fee, which I will help you protect. If you need me to do anything on this point, let me know.
Yours, Gordon

. Debbie Gordon testified at trial with regard to the specific parties who were listed on the settlement check:
Q. Ms. Gordon, could you please explain this?
*1145 A. This is just — This was the resolution stating — of our settlement and the day that it happened and that we accepted the settlement based on the mediation hearing.
Q. And what was your understanding as to how the settlement moneys were to be paid?
A. We were to get $1 million, and the attorneys got $250,000 for their fees, Gordon and John.
Q. So do you know how the settlement check was paid or how it was made out?
A. It was given to John with all of our — with Chimneywood Homeowners Association on it and John’s name. I don't remember if Gordon's name was on the check. But it was made out to all parties. And we got our portion once the check was deposited.

. S & W’s Petition of Intervention set forth the following: 1) S & W executed a contract of legal representation with Chimneywood to prosecute the case against the Defendants; 2) that for the work performed by S & W through Mr. Serou, S & W was to be compensated by the hour and also to receive a certain percentage of any judgment obtained by Chimneywood; 3) that in July 2007, Mr. Ser-ou resigned with S & W, and that thereafter, Mr. Serou continued his prosecution on the matter; 4) that S & W had an interest in the outcome of the suit, "opposed to the plaintiff and defendants herein” to the extent of legal services rendered and costs advanced on behalf of Chimneywood; 5) S & W claims that amount from any judgment and/or recovery obtained by Chimneywood; and 6) S & W reiterates and readopts all of the allegations of plaintiff’s petition for damages.

. Max Cohen represented Eagan Insurance ' Agency, Inc. in the Chimneywood matter. Mr. Cohen testified that he never had any contact with Mr. Sutterfield regarding the Chimneywood case. He further testified that Mr. Ryan was his primary contact until Mr. Serou was brought into the case, after which time he estimated that "I think it was a hundred percent of my contact, until seeing John [Ryan] at the mediation, was with Gordon.”

. Mr. Serou further argues that he instituted a summary proceeding to determine the reasonableness of attorney’s fees by filing a contradictory motion against S & W to withdraw his share of the funds in the registry of the court, which is permitted under La. C.C.P. art. 2592(1). Noting that the settlement check was made out to John Ryan, Gordon Serou and Chimneywood, Mr. Serou does not dispute that he is obligated to share those funds with S & W, but submits that he did not *1147 have to take any additional action to develop a property right to the fee.

. These factors also mirror Rule 1.5(a) of the Rules of Professional Conduct, which provides:
(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1)the time and labor required, the novelty and difficulty of the questions involved, and , the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

. See supra note 7.

. Ms. Gordon testified that Chimneywood discharged S & W from representation subsequent to Mr. Serou’s resignation from S & W:
Q. Did you have any relationship with anyone other than Gordon [Serou] at the Sut-terfield & Webb law firm?
A. No.
Q. Did you know that Mr. Serou left the Sutterfield & Webb firm?
A. Not when he immediately left, no.
Q. When did you find out that he left? Do you know?
A. I think it was in '07, '08 — it was by email — that he was no longer there and we needed to — I’m thinking. To keep him hired, we had to rehire him and to termi *1149 nate our relationship with Sutterfield because he no longer was there and we wanted to keep him as our attorney. So by email, I was notified that I needed to send an e-mail authorizing the termination and the rehiring of him.
[[Image here]]
Q. Ms. Gordon, this is Exhibit 23. Is this the e-mails [sic ] you're talking about?
A. Yes, it is.
Q. Did you authorize the transfer of the Chimneywood file to Gordon Serou’s new law firm?
A. Yes, I did.
Q. Why did you authorize that transfer?
A. Well, we wanted to keep Gordon Serou as our representation and we needed our files.
Q. Was it your understanding that you were terminating the attorney-client relationship with Sutterfield & Webb?
A. Yes.

.John Ryan testified regarding Chimney-wood’s discharge of S & W as follows:
Q. To your knowledge, did anyone else at Sutterfield & Webb contribute any work to the case?
A. Not to my knowledge.
Q. Do you know when Gordon Serou left Sutterfield & Webb?
A. I don’t know the date.
Q. Did you inform Chimneywood Homeowners Association that Gordon Serou had left Sutterfield & Webb?
A. Yes, I did.
Q. And what was their response?
A. Well, they wanted to continue with Gordon's involvement with the case. And as I recall, Jim Sutterfield required a disengagement letter, which did occur in some fashion. And subsequently we retained Gordon on identical terms as Sutterfield & Webb.
Q. So did Chimneywood Homeowners Association discharge Sutterfield & Webb?
A. That’s correct.

. John Ryan testified regarding Mr. Serou’s contributions to the Chimneywood matter:
Q. Who drafted the response to the defendant's motion for summary judgment?
A. Gordon did.
Q. What about who deposed the defendant’s expert?
A. Gordon did.
Q. Who went to trial to get — to court to get the trial date?
A. Gordon did.
Q. Who dealt with the defendants regarding the scheduling of the mediation?
A. I think we both did.
Q. And who negotiated the settlement at the mediation?
A. Well, we all did, but Gordon played a major role.

. ’’[T]he courts have declined to apply the joint venture theory to support an equal division of the fee when the attorneys have not been jointly involved in the representation of the client.” Dukes, p. 6, 878 So.2d at 521 (citing Brown 726 So.2d at 1022; Matter of P & E Boat Rentals, Inc., 928 F.2d at 665).

. See supra note 5.

. Ms. Gordon testified at trial regarding her understanding of the e-mail exchange with Mr. Ryan (see supra note 4):
Q. Ms. Gordon, I've shown you this before. This is Exhibit 26. Mr. Winstead asked you: Had you any knowledge of an agreement between Mr. Ryan and Mr. Serou? What was your understanding of that e-mail when you received it from Mr. Ryan?
A. This was to reiterate the terms of our original agreement. And it was just letting us know that nothing had changed and that it was still the same fee agreement, but just to, I guess, to protect all the parties, the ethical reasoning to let us know how it was going to be split. And our main concern was: Was it not gonna cost us more money?
Q. What do you mean by "nothing had changed"?
A. Well, this is the original — -I mean our agreement was we would pay the expenses while we were going through the hearing or the trial — not hearing or trial — the whole case. And then if we won, we would pay 20 percent. And Mr. Ryan had already told us, and we had already saw or we agreed that they would split their 20 percent—
Q. Who—
A. —-with Mr. Serou.
Q. Okay. Sorry to interrupt you. So—
A. So this was just a reaffirmation of the same terms that we all understood as the board of directors at Chimneywood.
*1151 Q. And this was after you terminated yoür relationship with Sutterfield & Webb; is that correct?
A. Yes, yes. This happened in '08. And by that time, we were just dealing — I mean, Gordon was not working at Sutterfield and Webb.

. See supra notes 8 and 14.

. The Louisiana Supreme Court originally issued an opinion in the matter on December 15, 1978. The Supreme Court was "[pjrompted by a change in composition of the court’s membership” to grant a rehearing. H. David Vaughan, II, The Application of Quantum Meruit to Attorney Fee Litigation, 49 La. L.Rev. 215, 224 (1988). Justice Calogero authored the majority opinion on rehearing.

. La. R.S. 37:218 currently provides as follows:
A. By written contract signed by his client, an attorney at law may acquire as his fee an interest in the subject matter of a suit, proposed suit, or claim in the assertion, prosecution, or defense of which he is employed, whether the claim or suit be for money or for property. Such interest shall be a special privilege to take rank as a first privilege thereon, superior to all other privileges and security interests under Chapter 9 of the Louisiana Commercial laws. In such contract, it may be stipulated that neither the attorney nor the client may, without the written consent of the other, settle, compromise, release, discontinue, or otherwise dispose of the suit or claim. Either party to the contract may, at any time, file and record it with the clerk of court in the parish in which the suit is pending or is to be brought or with the clerk of court in the parish of the client’s domicile. After such filing, any settlement, compromise, discontinuance, or other disposition made of the suit or claim by either the attorney or the client, without the written consent of the other, is null and void and the suit or claim shall be proceeded with as if no such settlement, compromise, discontinuance, or other disposition has been made.
B. The.term "fee”, as used in this Section, means the agreed upon fee, whether fixed or contingent, and any and all other amounts advanced by the attorney to or on behalf of the client, as permitted by the Rules of Professional Conduct of the Louisiana State Bar Association.

. The Court explained that its "equitable solution” protected the client as well as the attorneys involved:
In this way the client is prevented from reaping any possible unfair advantage resulting from the discharge of his attorney. Similarly by this resolution the client is not exposed to the risk of being penalized by being required to pay excessive and duplicitous legal fees for having chosen to exercise his right to discharge one attorney and retain the services of another.
Saucier, 373 So.2d at 118.

. The Court acknowledged the policy reasons behind the apportionment of the contingency fee between the attorneys:
Resort to the Code of Professional Responsibility also will have in the future a salutary effect of assuring that unethical conduct, such as solicitation on the part of one attorney of another’s client, will not be countenanced or rewarded. Knowing that a contingent fee may have to be shared provides an incentive for successor attorneys to encourage a client who has no just cause for complaint to maintain relations with his first attorney. And it encourages the lawyer first retained to seek resolution of the client's misgivings, thereby avoiding needless controversy and engendering public respect. We believe that this resolution will discourage professional disputes and encourage out-of-court settlements since each attorney will be encouraged to emphasize the positive contribution he made to the end result and subsequent counsel will be less inclined to contend there was cause to discharge all previous counsel. Perhaps more significant even than the foregoing reasons, which relate to governance of attorneys and the practice of law, is the fact that this solution should assure fair treatment of the client who will never be compelled to pay more than one reasonable contingency fee in an amount he has agreed to pay. And it permits the client to change attorneys without acting to his financial peril, whether or not he has "cause” to make the change in attorneys.
Saucier, 373 So.2d at 118-19.

. It is also noteworthy that, according to Max Cohen’s testimony, Mr. Cohen had virtually no contact or interaction with John Ryan until Mr. Ryan appeared at the mediation. See supra note 8.