| | | |
|---|---|---|
| **IKE SPEARS** | \* | **NO. 2024-CA-0075** |
| **VERSUS** | \* | **COURT OF APPEAL** |
| **WILLIAM W. HALL** | \* | **FOURTH CIRCUIT** |
| | \* | **STATE OF LOUISIANA** |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2010-07257, DIVISION "F-14"
Honorable Jennifer M Medley
\* \* \* \* \* \*
**Judge Paula A. Brown**
\* \* \* \* \* \*
(Court composed of Judge Sandra Cabrina Jenkins, Judge Paula A. Brown, Judge Karen K. Herman)

**JENKINS, J., CONCURS IN THE RESULT**
**HERMAN, J CONCURS IN THE RESULT**


Edwin Mark Shorty, Jr.
Hope L. Harper
EDWIN M. SHORTY, JR. & ASSOCIATES, APLC
650 Poydras Street, Suite 2515
New Orleans, LA 70130


      COUNSEL FOR PLAINTIFF/APPELLEE

Dominick F. Impastato, III
FRISCHHERTZ & IMPASTATO, L.L.C.
1140 St. Charles Avenue
New Orleans, LA 70130

Dane S. Ciolino
Clare S. Roubion
LOUISIANA LEGAL ETHICS, LLC
18 Farnham Place
Metairie, LA 70005


      COUNSEL FOR DEFENDANT/APPELLANT

This is a dispute over legal fees. Appellant, William W. Hall ("Mr. Hall"), appeals the district court's July 19, 2023 judgment, which found that Mr. Hall breached his joint venture agreement with Appellee, Ike Spears ("Mr. Spears"), and awarded Mr. Spears damages equal to one half of the contingency fee earned in the amount of $2,551,079.86, plus judicial interest, attorney's fees, expenses and court costs. Mr. Hall also seeks review of the district court's November 9, 2023 judgment, which denied his motion for new trial, in part.[1] For the reasons that follow, we affirm the district court's July 19, 2023 judgment.

## FACTUAL AND PROCEDURAL HISTORY

In its reasons for judgment, the district court clearly and concisely laid out the facts at issue. We have adopted and incorporated much of that recitation here.

On August 29, 2005, Hurricane Katrina ("Katrina") made landfall, which devastated the City of New Orleans and a large swath of the Gulf Coast Region. The case *sub judice* has its origins in the aftermath of Katrina and the damages it caused to the Port of New Orleans (the "Port"). Both Mr. Spears and Mr. Hall are attorneys in the New Orleans metropolitan area. In September 2005, Mr. Spears

---

[1] The district court granted Mr. Hall's motion for new trial, in part, strictly pertaining to the award of attorney's fees.

initiated contact with Mr. Hall to see if he might be interested in submitting a joint proposal with him to the Board, with the intention of being considered for legal work that would involve representing the Port in any Katrina-related litigation claims and FEMA-related issues.[2] Mr. Spears had a well-established relationship with certain members of the Board of Commissioners for the Port (the "Board"), as he was already serving as outside counsel for the Port prior to Katrina for other litigation matters. Mr. Hall had a relationship with a few members of the Board and a high level Port staff member, but had never done any work for the Port. Mr. Spears knew Mr. Hall from when Mr. Hall previously represented him in a fee dispute unrelated to the instant matter, and he approached Mr. Hall because he knew Mr. Hall also had a relationship with some of the Board members. The adjusting firm, Adjusters International ("AI"), was another party brought to the group by Mr. Spears and introduced to Mr. Hall. Mr. Hall agreed to collaborate with Mr. Spears.

Mr. Spears then scheduled a meeting with Gerald O. Gussoni, Jr. ("Mr. Gussoni"), Executive General Counsel ("GC") for the Port, together with Gary LaGrange ("Mr. LaGrange"), the President and Chief Executive Officer of the Port ("CEO"), to express their interest in representing the Port. Following, on October 11, 2005, Mr. Hall, Mr. Spears and AI presented Mr. LaGrange with an *Engagement Letter for Assistance with FEMA and Insurance Recovery*, which included a proposed fee for professional services of ten percent (10%) of the total insurance proceeds recovered. When the Board appeared uninterested in that offer, the trio subsequently submitted a *Contingent Fee Contract for Legal Services* to the Port on October 27, 2005, which outlined the following contingency fee rate:

---

[2] FEMA is the "Federal Emergency Management Agency."

- $0 to 20 million 6% (six);
- $20 million to 40 million 7% (seven);
- $60 million to (8%);
- $80 million to 100 million 9% (nine); and
- $100 million and up 20% (twenty)

This proposed contract included the provision that there would be "no fees on monies received prior to the signing of the agreement."

On December 1, 2005, William W. Hall & Associates and Spears & Spears, Attorneys at Law, a Cooperative Endeavor and AI (collectively, "Hall & Spears"), submitted a proposal in response to the Port's Request for Qualifications and Proposals for Insurance and FEMA Claims Management & Legal Services ("RFP"), wherein Hall & Spears set forth the following proposed fee schedule:

- $0 to $20,000,000 at 0%;
- $20,000,000 to $40,000,000 at 4%;
- $40,000,000 to $60,000,000 at 6%;
- $60,000,000 to $80,000,000 at 8%; and
- $80,000,000 to final resolution and settlement at 10%

This proposal also provided that "no fee was to be charged on monies received prior to this engagement."

A special meeting of the Board was held on December 7, 2005, during which Commissioner Bernard "Bunny" L. Charbonnet, Jr. ("Mr. Charbonnet") reported that the Executive Committee's recommendation was to "authorize Mr. LaGrange to award a contract for any legal services associated with Hurricane Katrina catastrophe losses to the team of Hall & Spears."[3] Acting upon that recommendation, the Board voted to direct Mr. LaGrange to "take steps necessary to award these contracts and negotiate appropriate fees commensurate with the

---

[3] The minutes from that meeting indicate that the Executive Committee also recommended that the CEO "award the insurance claims management services contract to the team of Ernst and Young; and the FEMA claims management services contract to Adjusters International."

Board's ability to pay." This resolution did not specify, require, stipulate, or insinuate whether the contract had to be awarded via contingency fee or hourly rate fee. On May 31, 2006, a meeting was held between Mr. Gussoni and Mr. Hall, with the exclusion of Mr. Spears.[4]

At the special Board meeting, Mr. Gussoni offered to retain Hall & Spears on an hourly-fee basis. According to testimony elicited at trial, as soon as the meeting concluded, Mr. Hall called Mr. Spears to relay the Port's proposal, whereupon Mr. Spears suggested that Mr. Hall meet him later that evening at the Windsor Court Polo Lounge to discuss this development. When Mr. Spears arrived at the Polo Lounge, Mr. Hall was already there with two representatives from AI—Pat Bickford ("Mr. Bickford"), one of AI's owners/principals, and Brian Rivera, AI's Director of Operations. After Mr. Hall explained that Mr. Gussoni was in the process of drafting an hourly-fee contract for Hall & Spears, Mr. Spears informed the group that he was not interested in doing hourly work.[5] Soon afterwards, Mr. Spears left the lounge.

Just a few days later, on June 2, 2006, Mr. Gussoni sent an email to both Mr. Hall and Mr. Spears. Attached to the email was an engagement letter to Hall & Spears, proposing to employ both attorneys at a rate of $200.00 per hour, and bearing signature lines for each of them. After reading the email, Mr. Hall contacted Mr. Gussoni to inform him that Mr. Spears was not interested in an hourly-fee contract. In response, Mr. Gussoni emailed a second engagement letter,

---

[4] We note that during this time, the City of New Orleans was not up and operational for residents and nearly everyone was operating from other states or between states. Because Mr. Spears was traveling back and forth from Massachusetts with his family and Mr. Hall was in Metairie and local, Mr. Spears designated Mr. Hall as the point of contact with the client.

[5] At trial, Mr. Hall testified that Mr. Spears informed the group that he was "not interested in doing any chicken-s*** hourly work." Mr. Spears called into question whether he used such strong language, but conceded that he had no interest in an hourly-fee contract.

also dated June 2, 2006, to Mr. Hall, which was almost identical to the first, but with two notable differences: (1) it contained an offer only to and a signature line only for Mr. Hall; and (2) it reduced the amount of required professional liability insurance from $5,000,000.00 to $1,000,000.00. Although Mr. Hall was unable to say for certain when he actually received it, he testified that he executed the engagement letter within a week or two of that date and began to work on the Port's claims almost immediately.

At some point in 2007, Mr. Hall indicated that the Port was at loggerheads with one particular insurer, FM Global, the Port's risk management property insurer. In order to get the claims process moving more rapidly, Mr. Hall began seeking to pursue litigation on the basis of bad faith. Mr. Bickford from AI suggested a few different attorneys that Mr. Hall might consider bringing in to assist his firm. Mr. Hall consulted with Mr. Gussoni, who expressed that his first choice from among those suggestions was Florida attorney William "Chip" Merlin ("Mr. Merlin"), an attorney who had nearly 15 years of experience in handling claims such as that facing the Port. Mr. Hall then set up a one-on-one meeting with Mr. Merlin. Impressed with Mr. Merlin after this initial meeting, Mr. Hall recommended that Mr. Gussoni meet with Mr. Merlin with an eye to bringing him on board. After Mr. Merlin met with both Mr. Hall and Mr. Gussoni near the end of September 2007, the decision was made to attempt to hire Mr. Merlin to assist with the Port's claims; however, Mr. Merlin made it clear that he would not work for an hourly fee—he was only interested in the work if he would be paid a contingency fee.

In his deposition, Mr. Gussoni testified that, considering the issues with FM Global and Mr. Merlin's expertise, both he and the Board decided to acquiesce and

5

offered a contingent fee contract to Mr. Hall and Mr. Merlin (collectively, "Hall & Merlin") for their joint representation. Mr. Hall testified that at this time he mentioned to Mr. Gussoni that Mr. Spears might be interested in participating in the case now that a contingency fee offer was on the table. According to Mr. Hall, Mr. Gussoni instructed him not to share this information with Mr. Spears because the Port was about to file a suit for legal malpractice against Mr. Spears for his work on an unrelated case.[6] Mr. Gussoni, to the contrary, testified that he did not recall this conversation with Mr. Hall.

The terms of the new Hall & Merlin contract differed from the proposal made by Hall & Spears in that no fees would be collected by the attorneys for any sums paid by the insurer totaling less than $75,000,000.00. The fee schedule in this contract provided the following:

RISING CONTINGENT FEE

0.0% - of gross recovery up to $75,000,000.00

20.0% - of gross recovery from $75,000,000.00 up to $85,000,000.00

25.0% - of gross recovery from $85,000,000.00 up to $95,000,000.00

33.3333% - of gross recovery from $95,000,000.00 or more

The contract further clarified that the fees would only be paid for the additional amount of monies received in excess of $75,000,000.00. The contract was executed by Mr. Hall, Mr. Merlin, Mr. Gussoni and Mr. LaGrange on November 1, 2007.[7] Following, on November 10, 2007, Mr. Hall and Mr. Merlin executed a

---

[6] The malpractice suit was filed approximately one week before the contingent fee contract was executed.

[7] An associate of Mr. Merlin's, Deborah Trotter, also executed the contract.

separate agreement that they would share any contingency fees equally—i.e., 50% each.

On November 10, 2008, a settlement agreement was reached by the parties, in which FM Global agreed to settle the Port's claim in the amount of $117,500,000.00. Mr. Hall's share of the attorney's fees earned him the gross amount of $6,002,278.31, from which $900,118.58 was deducted for the hourly fees already paid to him. Mr. Spears testified at trial that he was unaware of the contract or the settlement until one of the Board members congratulated him on being a part of the settlement. At a later meeting in 2009, Mr. Spears told Mr. Hall that he was entitled to one half of the contingency fee earned by him because the two had established a joint venture; however, Mr. Hall disagreed.

Mr. Spears filed a petition for damages on July 14, 2010, seeking to recover one half of the contingency fee earned by Mr. Hall, as well as attorney's fees and costs. In the petition, Mr. Spears alleged that Mr. Hall had utilized Mr. Spears' name and reputation to submit a joint proposal to the Board, and once the Board awarded Hall & Spears the contract, Mr. Hall discarded him in order to retain all of the attorneys' fees for himself. Additionally, Mr. Spears initially asserted a claim for unjust enrichment in his original petition, but later waived that claim; thus, the only issues before the district court were whether a joint venture existed with Mr. Spears at the time Mr. Hall entered into a contingent fee contract with the Port and Mr. Merlin, and if so, whether Mr. Spears was entitled to one half of the contingency fee proceeds on that basis, or whether he was entitled to damages equal to one half of those proceeds.

A two-day bench trial began on March 20, 2023. There, Mr. Spears testified that the idea for Mr. Hall and him to pitch a contingency contract to the Board for

Katrina insurance work was his. Mr. Spears further testified that he and Mr. Hall had a joint venture agreement, albeit oral, that they would split any attorneys' fees 50/50. According to Mr. Spears, it was through his relationships that he delivered this insurance work from the Board to Hall & Spears. In addition, Mr. Spears related that as soon as the work that he and Hall pursued became available—a contingency contract—Mr. Hall deliberately failed to inform him. Mr. Spears attested that his attorney-client relationship in regards to the Katrina insurance work existed between him and the Port on December 7, 2006, the day the Board voted to accept the proposal of Hall & Spears and AI.

At the trial's conclusion, the district court took the matter under advisement and asked that both parties file post-trial memoranda. On July 19, 2023, the district court issued its judgment and reasons for judgment, wherein it concluded that a joint venture did exist at the time of the execution of the contingent fee contract. The district court further concluded that Mr. Hall breached the agreement and his fiduciary duty to Mr. Spears by executing a contingency fee agreement with the Port that excluded Mr. Spears. The district court rendered judgment against Mr. Hall and in favor of Mr. Spears, awarding Mr. Spears general damages in the amount of $2,551,079.86, an amount equal to one half of the contingency fee, plus judicial interest, attorney's fees, expenses and court costs. On July 26, 2023, Mr. Hall filed a motion for new trial. In his motion, Mr. Hall argued that: no joint venture existed between the parties; the district court failed to consider whether public policy prohibited Mr. Spears from sharing a contingency fee under Rules 7.2(c)(13) and 1.5(e) of the Rules of Professional Conduct; and the district court's award of attorney fees was not permitted under the law. The district court

8

granted Mr. Hall's motion for new trial as to the attorney fees, but in all other respects the motion was denied. This timely appeal followed.

## DISCUSSION

On appeal, Mr. Hall raises two assignments of error, which we summarize as follows: (1) the district court erred in finding that a joint venture existed between Mr. Hall and Mr. Spears; and (2) even if a joint venture existed, the district court erred in awarding Mr. Spears one half of a contingency fee when he performed no legal work for the client, in violation of the Louisiana Rules of Professional Conduct. Before addressing the assigned errors, we will first set forth the applicable standard of review.

*Standard of Review*

As this Court has previously noted, "while what constitutes a joint venture is a question of law, the existence or nonexistence of a joint venture is a question of fact." *Arcement Boat Rentals, Inc. v. Good*, 01-1860, p. 6 (La. App. 4 Cir. 5/29/02), 820 So.2d 615, 618 (citing *Grand Isle Campsites, Inc. v. Cheek*, 262 So.2d 350, 357 (La. 1972)). "Factual determinations are subject to the manifest error standard of review." *Wootan & Saunders v. Diaz*, 17-0820, p. 5 (La. App. 4 Cir. 3/28/18), 317 So.3d 390, 395 (citing *Stobart v. State, through DOTD*, 617 So.2d 880, 882 (La.1993)). "Similarly, mixed questions of law and fact are reviewed under the manifestly erroneous standard of review." *Id.* (citing *Chimneywood Homeowners Ass'n, Inc. v. Eagan Ins. Agency, Inc.*, 10-0368, p. 5 (La. App. 4 Cir. 2/2/11), 57 So.3d 1142, 1146). "In order to reverse a fact finder's determination of fact, an appellate court must find from the record that a reasonable factual basis does not exist for the finding and that the record establishes that the finding is clearly wrong." *Id.* (citing *Stobart*, 617 So.2d at

9

882). However, "[w]here one or more legal errors interdict the [district] court's fact-finding process . . . the manifest error standard becomes inapplicable, and the appellate court must conduct its own *de novo* review of the record." *Id.* (quoting *Hamp's Constr., L.L.C. v. Hous. Auth. of New Orleans*, 10-0816, p. 3 (La. App. 4 Cir. 12/1/10), 52 So.3d 970, 973). "A legal error occurs here when a [district] court applies incorrect principles of law and such errors are prejudicial." *Id.* at p. 6, 317 So.3d at 395. "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Id.* With these principles in mind, we now turn to the assigned errors.

*Joint Venture*

This Court has explained that a "[j]oint venture has been defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.'" *Lemoine Co., L.L.C. v. Ernest N. Morial Exhibition Hall Auth.*, 22-0217, p. 10 (La. App. 4 Cir. 4/12/23), 369 So.3d 39, 47, *rev'd on other grounds*, 23-00775 (La. 10/17/23), 372 So.3d 327 (quoting *Arcement*, 01-1860, p. 6, 820 So.2d at 618). "[J]oint adventures [sic] arise only where the parties intended the relationship to exist. They are ultimately predicated upon contract either express or implied." *Arcement*, 01-1860, p. 6, 820 So.2d at 618 (alteration in original) (quoting *Pillsbury Mills, Inc. v. Chehardy*, 90 So.2d 797, 801 (La. 1956)).

"Under Louisiana law, in order to confect a valid contract, four elements are required: (1) the capacity to contract; (2) mutual consent; (3) a certain object; and (4) a lawful cause." *Succession of Schimek*, 19-1069, p. 14 (La. App. 4 Cir. 6/10/20), 302 So.3d 78, 89 (citations omitted). "The 'elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and

10

resulting damages.'" *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 19-0181, p. 8 (La. App. 4 Cir. 7/31/19), 276 So.3d 589, 595 (quoting *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 14-1326, p. 5 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1216). "It is well-settled that '[t]he party claiming the rights under the contract bears the burden of proof.'" *Id.* at pp. 8-9, 276 So.3d at 595 (alteration in original) (citation omitted). This Court expounded that in order to meet that burden of proof to demonstrate the existence of a joint venture, three requirements must be established:

> (A) All parties must consent to formation of a partnership;
>
> (B) There must be a sharing of losses of the venture as well as the profits; and
>
> (C) Each party must have some proprietary interest in, and be allowed to exercise some right of control over, the business.

*Arcement*, 01-1860, p. 6, 820 So.2d at 618 (quoting *Marine Servs., Inc. v. A-1 Indus., Inc.*, 355 So.2d 625, 628 (La. App. 4 Cir. 1978)).

Finding that a joint venture between Mr. Hall and Mr. Spears existed at the time the contingency fee contract was executed, the district court reasoned that the previous actions of the two attorneys indicated an intent to enter into a contractual relationship, albeit without a formal written document. Specifically, the court cited the meeting between Hall & Spears, and the GC and CEO of the Port; the two separate joint letters of engagements sent to the Port; and the joint proposal with Hall & Spears and AI, which followed the Port's Request for Qualifications and Proposals for Insurance and FEMA claims Management and Legal Services. As the district court rightly noted, La. C.C. art. 1927 provides that "[a] contract is formed by the consent of the parties established through offer and acceptance . . . [O]ffer and acceptance may be made orally, in writing, or by action or inaction that

under the circumstances is clearly indicative of consent." Further, the court found that the Board resolution selecting Hall & Spears to be awarded a contract for their legal services and the subsequently-offered engagement letter that included both of their names served to corroborate the existence of a joint venture.[8] To the district court, this satisfied the first prong of the joint venture requirements by demonstrating that Mr. Hall and Mr. Spears consented to forming a partnership. Next, the district court found that evidence adduced at trial demonstrated that there was an agreement between the two as to how the contingency fee would be earned, establishing that there was a sharing of losses and profits of the venture. However, the court determined that Mr. Spears was prevented from participating in the sharing of the losses and profits from the contingency fee agreement due to Mr. Hall's breach of the joint venture relationship. Lastly, it found that the award of the legal work that was passed by resolution of the Board gave the team of Hall & Spears the opportunity to exercise a right of control.

Mr. Hall argues to this Court that, even assuming a joint venture was established with Mr. Spears for the purpose of obtaining a contingency fee contract with the Port, the venture failed and ended when the Port offered an hourly fee contract to Hall & Spears on May 31, 2006. Further, he takes issue with the district court's finding that Mr. Spears never rejected the initial proposed hourly fee agreement, holding that the joint venture was still in existence in 2007 when Mr. Hall and Mr. Merlin were offered the contingent fee contract. Mr. Hall asserts that Mr. Spears did, in fact, reject the Port's hourly fee contract proposal when he

---

[8] We note that "a [district] court's reasons for judgment are not part of the judgment and that appellate courts review judgments, not reasons for judgment. But, appellate courts may consider a [district] court's reasons for judgment to obtain insight into the . . . judgment." *Heard, McElroy & Vestal, L.L.C. v. Schmidt*, 22-0221, p. 16 (La. App. 4 Cir. 9/21/22), 349 So.3d 663, 673 (citing *Bruno v. CDC Auto Transp., Inc.*, 19-1065, p. 9 (La. App. 4 Cir. 6/3/20), 302 So.3d 8, 13 n.11) (internal citations omitted).

12

left the meeting at the Windsor Court Polo Lounge after declaring that he was not going to do hourly work. Regardless, Mr. Hall suggests, the issue is not whether Mr. Spears rejected the offer; rather, under the codal articles governing offer and acceptance, the issue is whether Mr. Spears accepted the Port's offer of an hourly fee contract. Thus, Mr. Hall contends that whether the hourly fee contract offer made by the Port is considered to be irrevocable or revocable, Mr. Spears' failure to timely accept the offer ultimately extinguished the offer.

> Louisiana Civil Code article 1928, regarding irrevocable offers, provides:
>
> An offer that specifies a period of time for acceptance is irrevocable during that time.
>
> When the offeror manifests an intent to give the offeree a delay within which to accept, without specifying a time, the offer is irrevocable for a reasonable time.

Louisiana Civil Code article 1929 then directs that "[a]n irrevocable offer expires if not accepted within the time prescribed in the preceding Article." As it pertains to revocable offers, La. C.C. art. 1930 explains that "[a]n offer not irrevocable under Civil Code Article 1928 may be revoked before it is accepted." And, similarly to La. C.C. art. 1929, La. C.C. art. 1931 instructs that "[a] revocable offer expires if not accepted within a reasonable time."

Although Mr. Spears does not directly counter these arguments, it is clear from his testimony that he considers the original authorization by the Board for Mr. LaGrange to award the insurance claim management contract to Hall & Spears to be a contract that was still viable at the time the contingent fee contract was offered to Mr. Hall and Mr. Merlin. Continuing, Mr. Spears contends that only the Board was authorized to terminate the contract, not Mr. Gussoni or Mr. LaGrange. Mr. Spears then asserts that Mr. Gussoni and Mr. LaGrange acted outside of their

13

authority when they removed his name from the Katrina litigation, when the Board had the sole authority to approve outside counsel contracts. Next, he argues that because joint ventures are governed by the law of partnership (*see, e.g.*, *Transit Mgmt. of Se. La., Inc. v. Grp. Ins. Admin., Inc.*, 226 F.3d 376, 383 (5th Cir. 2000), Mr. Hall could not unilaterally terminate the joint venture[9] and had a fiduciary duty of loyalty to him.[10] Finally, he insists that Mr. Hall's actions showed that he intentionally failed to inform Mr. Spears that the possibility of a contingency fee contract had materialized.

Louisiana jurisprudence is clear that "[w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Braud v. Bernstein*, 23-0332, p. 4 (La. App. 4 Cir. 12/20/23), 381 So.3d 58, 62 (quoting *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)). The law is equally clear that when applying the manifest error standard of review to the district court's interpretation of the contract, an appellate court "may not simply substitute its own view of the evidence for the [district] court's view, nor may it disturb the [district court's finding of fact so long as it is reasonable." *Bartlett Constr. Co., Inc. v. St.*

---

[9] *See* La. C.C. art. 2807, which provides in pertinent part that "[u]nless otherwise agreed, unanimity is required to . . . terminate the partnership."

[10] Mr. Hall counters that our Supreme Court has held that "as a matter of public policy, based on our authority to regulate the practice of law pursuant to the constitution, no cause of action will exist between co-counsel based on the theory that co-counsel have a fiduciary duty to protect one another's prospective interests in a fee." *Scheffler v. Adams and Reese, LLP*, 06-1774 p. 16 (La. 2/22/07), 950 So.2d 641, 653. However, based upon our discussion, *infra*, we find the case *sub judice* hinges upon a breach of contract, not a dispute over prospective interest in a fee. Therefore, we find *Scheffler* to be inapposite to the facts before us.

*Bernard Par. Council*, 99-1186, pp. 4-5 (La. App. 4 Cir. 5/31/00), 763 So.2d 94, 97 (citing *Syrie v. Schilhab*, 96-1027, p. 4 (La. 5/20/97), 693 So.2d 1173, 1176).

At the outset, we note the conflicting testimony of Mr. Hall and Mr. Gussoni. While Mr. Hall testified that Mr. Gussoni instructed him not to contact Mr. Spears about the upcoming contingency fee contract, Mr. Gussoni did not recall that conversation. Moreover, we find disturbing the subsequent actions of Mr. Gussoni and Mr. LaGrange to negotiate a contingency fee agreement on behalf of the Board with Hall & Merlin when the record evidence reflects that Mr. LaGrange was only authorized to negotiate a contract with "the team of Hall & Spears." In his deposition, Mr. Gussoni explained that, in response to the RFP from the Board, some 25 or 26 law firms submitted proposals to assist the Port in settling its Katrina-related claims. After a careful vetting of all of these firms, the Executive Committee of the Board recommended that the Board choose the team of Hall & Spears. The Board voted to ratify that recommendation and authorized Mr. LaGrange to enter into a contract with them. Mr. Charbonnet testified that he did not recall any conversations by the Board that would have contemplated either Mr. Hall or Mr. Spears individually doing the legal work for the Port. Mr. Hughes, Chair of the Property and Insurance Committee, testified at trial that he believed the team of Hall & Spears, together with AI, were the perfect attorneys to get the job done. Using an analogous situation, Mr. Hughes further testified that if a team of two contractors was selected by the Board and the Board later learned that one of those two contractors would no longer be involved, the Board would either make another decision about whether it wished to proceed with that single contractor or select another contractor from its list formulated through the RFP process. When Mr. LaGrange was questioned as to whether there was any meeting

15

by the Board that approved anyone other than Hall & Spears to handle the Port's insurance claims, Mr. LaGrange responded, "I don't recall, but they would have had to, to do so legally." Thus, based upon the testimony elicited at trial, the Board should have either negotiated the terms of the contingency agreement with Mr. Spears as a member of the Hall & Spears team that was awarded the contract, or it should have terminated the award of the contract and reconsidered as a Board whether they wished to use only the services of Mr. Hall or some other firm that they had already vetted through the RFP process. Notably, none of the Board members, Mr. Gussoni or Mr. LaGrange are named defendants in this matter.

Review of the record before us does not contain any other Board meeting minutes other than those produced from the December 7, 2005 meeting, or any other communications by the Board pertaining to another offer to contract for legal services by anyone other than Hall & Spears. The only other pertinent documents are the letter of engagement to Mr. Hall alone—sent exclusively by Mr. Gussoni, and the contingency fee agreement with Mr. Hall and Mr. Merlin, executed by Mr. LaGrange and Mr. Gussoni on behalf of the Board. There is no dispute that the original engagement letter offered to Hall & Spears by Mr. Gussoni was never executed by Mr. Spears. Whatever the form of the offer—revocable or irrevocable—we agree with Mr. Hall that this offer for an hourly fee contract was not still viable in 2007 because it had not been accepted within a reasonable time.

Nevertheless, we do not find that any of these actions necessarily extinguished the joint venture. There was testimony from both Mr. Hall and Mr. Spears that they continued to communicate about the Port's claims during the period that Mr. Hall was working under an hourly fee agreement and before the new contingency fee agreement was offered. Mr. Spears also testified that he

continued to press Mr. Hall to seek a contingency fee agreement from the Port on behalf of Hall & Spears. Accordingly, our review of the record indicates that the district court reached a reasonable conclusion when it found that the joint venture agreement was still in effect at the time the contingency fee agreement was offered and executed. This assignment of error is unpersuasive.

*Damages*

In this assignment of error, Mr. Hall posits that the district court erred when it awarded Mr. Spears one half of the contingency fee that he earned because sharing the fees with Mr. Spears is against public policy on either of two discrete bases. First, under Rule 7.2(c)(13) of the Louisiana Rules of Professional Conduct (sometimes hereinafter "LRPC"), attorneys are expressly prohibited from paying referral fees. The Rule provides, in relevant part, that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services." Second, LRPC Rule 1.5(e), which was reenacted on January 20, 2004, and became effective on March 1, 2004, sets forth that:

> A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) the client agrees in writing to the representation by all of the lawyers involved, and is advised in writing as to the share of the fee that each lawyer will receive;
>
> (2) the total fee is reasonable; and
>
> (3) each lawyer renders meaningful legal services for the client in the matter.

The absence of a written and executed fee agreement between Mr. Spears and the Port, Mr. Hall argues, means that the first prerequisite under Rule 1.5(e) is not met. Moreover, alluding to the third requirement under this Rule, Mr. Hall points out that Mr. Spears unequivocally testified that he did no work on behalf of the Port,

17

but that he delivered the client. Additionally, Mr. Hall advances the position that the LRPC is to be treated as substantive law. As such, Mr. Hall, citing to La. C.C. art. 7, asserts that the district court's ruling that awarded one half of his contingency fee with Mr. Spears was in error. Louisiana Civil Code article 7 provides:

> Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity.

That is to say, if the joint venture agreement allowed for an award of fees to Mr. Spears without a written agreement with the client and without Mr. Spears performing any meaningful work on behalf of the client, that agreement is against the public interest and is, therefore, an absolute nullity.

Mr. Spears, in response, first alleges that Mr. Hall has not previously raised the issue of LRPC Rule 7.2(c), but even so, Mr. Spears avers that he did more than just recommend a lawyer—he initiated the entire representation.[11] Next, Mr. Spears cites to the pre-2004 version of LRPC Rule 1.5(e), which was more permissive than the current version and allowed that:

> A division of fee between lawyers who are not in the same firm may be made only if:
>
> (1) The division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibilities for the representation;
>
> (2) The client is advised of and does not object to the participation of all the lawyers involved; and
>
> (3) The total fee is reasonable.

---

[11] Our review of the record reveals that in his opposition to Mr. Spears' motion for summary judgment, Mr. Hall did, in fact, argue to the district court that LRPC Rule 7.2(c)(13) is applicable to the instant case. Therefore, we will consider that Rule in our discussion.

In further support, Mr. Spears cites to three cases for the proposition that a fee-splitting agreement between two attorneys not in the same firm is sufficient to establish a joint venture; thus, the rules of contract apply to any alleged breach, not the LRPC.[12]  We agree; however, our review of these cases finds that they are distinguishable from the matter at hand.

First, in *Raspanti* v. *Litchfield,* 19-0523 (La. App. 4 Cir. 2/12/20), 364 So.3d 131, Raspanti and Litchfield entered into an oral attorney fee agreement to divide legal fees. In that case, it was acknowledged by both attorneys that each had provided some measure of work on behalf of the clients. Raspanti sought to have the contract dissolved based upon an allegation that Litchfield breached the fee agreement by failing to pay his portion of the defense costs.  This Court, using the pre-2004 version of Rule 1.5(e), concluded that the Rules of Professional Conduct did not prohibit the enforcement of this agreement and found that when a joint venture existed with a valid oral fee-splitting agreement, a fee dispute amongst the attorneys was governed by contract rather than the LRPC.

Next, in *Scurto v. Siegrist,* 598 So.2d 507 (La. 1992), attorneys Siegrist and Scurto entered into a valid contingency fee-splitting agreement to represent a client.  The agreement set forth that Scurto was responsible to manage the client and advance costs, and it delineated the portion of the fees that were to be received by each.  When it was time to split the fees, Siegrist alleged that Scurto had not performed sufficient work to earn his portion of the fees.  The appellate court found that Scurto was actively involved in the case by frequently communicating with the client, advancing expenses, attending depositions and performing legal

---

[12] Mr. Spears cites: *Raspanti* v. *Litchfield,* 19-0523 (La. App. 4 Cir. 2/12/20), 364 So.3d 131; *Scurto v. Siegrist,* 598 So.2d 507 (La. 1992); and *Wootan & Saunders*, 17-0820, 317 So.3d 390.

research. Thus, the court held that the contract was valid, enforceable and did not violate the Rules of Professional Conduct, and that it would not assume the position of dictating to attorneys exactly how much work they needed to perform to entitle them to a certain fee and both attorneys had actually performed work on behalf of the client.

Finally, in *Wootan & Saunders*, 17-0820, 317 So.3d 390, Wootan & Saunders ("WS"), primarily a defense firm, performed some preliminary work on behalf of the client in a wrongful death suit. After vetting several personal injury attorneys on behalf of the client, the attorney Diaz was selected, at which time WS handed over the client files and entered into a contingency fee-splitting agreement with Diaz. The agreement provided for a division of fees of 75% to be paid to Diaz for handling the majority of the work and 25% to WS for the work it previously performed before Diaz's involvement and its continued assistance in communicating with the client. When the fees were to be split, Diaz argued that WS had not done enough work to earn its 25% share. As in *Scurto*, this Court—in finding that the fee-splitting agreement complied with the Rules of Professional Conduct—held that it would not interfere with the contractual relations of two attorneys who had both performed work in the case.

Thus, although each of the cases cited by Mr. Spears established a joint venture—whether oral or written—one distinguishing factor is that the attorney participating in the contingency agreement actually performed some measure of work on behalf of the client. *See Chimneywood*, 10-0368, 57 So.3d 1142 (where this Court held that, in the absence of a fee-splitting or joint representation agreement, a law firm was not entitled to fully share in a contingency fee when the attorney who worked the file left the firm and the firm was not actively involved in

the case after his departure.  Instead, "the remainder of the contingency fee should be disbursed 'according to the respective services and contributions of the attorneys for work performed and other relevant factors.'"  *Id.* at p. 15, 57 So.3d at 1152 (quoting *Saucier v. Hayes Dairy Prods, Inc.*, 373 So.2d 102, 118 (La.1979)); *see also Fox v. Heiser*, 03-1964 (La. App. 4 Cir. 5/12/04), 874 So.2d 932 (where this Court found that advancing costs and keeping records constituted sufficient involvement in the case to share fees under an oral fee agreement); *see also Dukes v. Matheny* 02-0652 p. 4, 878 So.2d 517, 520 (citations omitted)) (where the appellate court noted that "courts have continued to apply the joint venture theory to uphold an agreement to share fees where two attorneys have executed a single contingency fee contract with the client. In such cases, the finding of a joint venture has been based on the fact that neither attorney has been discharged and both were actively involved in the case and remained responsible to their client."

As we have just outlined, this long line of cases established the precedent that fee-splitting agreements between attorneys from different firms did not violate the pre-2004 version of Rule 1.5(c), which allowed attorneys to decide between themselves the division of labor and fees without informing or obtaining consent from the client.[13]  *See, e.g.*, *Fox*, 03-1964, p. 9, 874 So.2d at 938 (where the court explained that a dispute over the validity of an oral fee-splitting agreement was "neither a suit for recovery of attorney's fees nor a suit over the terms of the settlement agreement;" therefore, the agreement was not violative of public policy or the Rules of Professional Conduct); *see also Scurto*, 598 So.2d at 509-10 (where the court commented that "the suit by an attorney to recover pursuant to [a

---

[13] *Compare Chimneywood*, 10-0368, p. 1, 57 So.3d at 1133-34 (where the court noted that the attorney obtained the consent of his client in order to collaborate with another attorney and detailed the fee schedule applicable to each attorney).

contingency fee-splitting] agreement is a suit to recover for breach of the agreement to share in the fund resulting from payment of the fee. It is not a suit for recovery of attorney's fees.").

While we agree with Mr. Hall that the Rules of Professional Conduct do carry the force of substantive law, both his and Mr. Spears' arguments fail to see the larger picture. *See Kaltenbaugh v Bd. Of Supervisors, S. Univ. & Ag. & Mech. Coll.*, 22-0092 pp. 18-19, 346 So.3d 823, 836 (wherein the court explained that "[T]he [R]ules of Professional Conduct are rules issued and published by the Supreme Court of Louisiana. As such, these rules are recognized as having the force and effect of substantive law.") Under the particularized set of facts presented to us in the case *sub judice*, the most discernible difference is that there is not a single case cited by either party in which an attorney was deprived of the opportunity to participate in representing the client—the choice was theirs. Having found that the district court had a reasonable basis to conclude that a joint venture existed between Mr. Spears and Mr. Hall, we similarly find that the district court was not in error when it determined that Mr. Hall breached that contractual relationship. The court weighed the testimony—both from the trial and the depositions entered into the record—and determined that, based upon the continued communication between Mr. Spears and Mr. Hall and the fact that neither of them had taken an affirmative step to end the joint venture relationship, that agreement was still active at the time Mr. Hall was offered a contingency fee contract with the Port. When Mr. Hall failed to disclose to Mr. Spears that there was an opportunity to enter into the contingency fee contract—the object of the venture—he deprived Mr. Spears of the opportunity to provide representation to the Port, which breached the oral contract between the two. As we previously

noted, Mr. Hall contends that he was instructed by Mr. Gussoni to refrain from apprising Mr. Spears of the contingency fee offer, while Mr. Gussoni could not recall any such conversation. Faced with this conflicting testimony, the district court made a credibility determination. It is well settled, though, that "[i]t is the role of the factfinder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact." *Granger v. Christus Health Cent. La.*, 12-1892, p. 26 (La. 6/28/13), 144 So.3d 736, 756 (citing *State in Interest of D.M.*, 2011–2588 (La.6/29/12), 91 So.3d 296, 298 (per curiam). Hence, the remaining issue before this Court is whether the damages award in favor of Mr. Spears was legally correct.

"An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance may consist of giving, doing, or not doing something." La. C.C. art. 1756. Louisiana Civil Code article 1994 provides, in pertinent part, that "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation." "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. C.C. art. 1995. It then follows that "lost business opportunities are cognizable damages[.]" *Kocurek v. Frank's Int'l, LLC*, No. 16-CV-0543, 2017 WL 4582337 at *8, (W.D. La. Oct. 11, 2017) (citing *Buddy's Tastee No. 1, Inc. v. Tastee Donuts, Inc.*, 483 So. 2d 1321, 1324 (La. Ct. App. 1986)). "To prevail on a claim for a lost business opportunity, [a] [p]laintiff[] must prove that it is 'more probable than not' that, had [the obligor] not breached the contract, they would have availed themselves of the profitable opportunity." *Id.* (quoting *Wood v. Axis Energy Corp.*, 04-1464, pp. 13–14 (La. App. 3 Cir. 4/6/05), 899 So. 2d 138, 148). In this case, the district court made it clear that its

23

decision was premised on a breach of contract claim, not a fee dispute over the attorney's fees generated from the FM Global settlement. As such, the court found the LRPC was inapplicable and nothing more than a "red herring." Furthermore, Mr. Spears testified that he was prepared to avail himself of an opportunity to represent the Port on a contingency fee basis. Therefore, in order to compensate Mr. Spears for his lost business opportunity that resulted in lost profits, Louisiana jurisprudence provides a guide. We only recently explained in *Huntsman Int'l, L.L.C. v. Praxair, Inc.*, that "[c]ompensatory damages are those awarded on the basis of the loss suffered and are designed to replace the loss caused by the wrong or injury." 22-0777, p. 6 (La. App. 4 Cir. 4/19/24), ___ So.3d ____, ____, 2024 WL 1695071 at *3 (quoting *FIE, LLC v. New Jax Condo Ass'n*, 16-0843, 17-0423, pp. 13-14 (La. App. 4 Cir. 2/21/18), 241 So.3d 372, 387). "Compensatory damages are further divided into the broad categories of special damages and general damages." *Id.* "Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty." *Id.* "Loss of business income or profits is a type of special damages." *Id.* at pp. 6-7, 2024 WL 1695071 at *3 (quoting *Cox, Cox, Filo, Camel & Wilson, LLC v. La. Workers' Comp. Corp.*, 21-00566, p. 8 (La. 3/25/22), 338 So.3d 1148, 1155.

Here, relative certainty of the damages award was provided by the settlement statement, which gave a detailed accounting of the amount of both the hourly and the contingency fee earned by Mr. Hall. This gave the district court an easily ascertainable ready market value for the amount of lost business income suffered by Mr. Spears. Additionally, we agree that LRPC 1.5(e) is not germane to the set of facts before us. Our review of the history surrounding this rule

24

indicates that its spirit is to protect the public from opaque contracts with attorneys who, in turn, farm out their representation to an attorney not contracted by the client. That is not the case before us. As the district court found, although the Board awarded the opportunity to enter into a contract to Hall & Spears, Mr. Hall breached his fiduciary duty to Mr. Spears when he prevented him from the opportunity to enter into a contingency fee contract with the Port. Accordingly, we find the district court did not err when it awarded damages to Mr. Spears for Mr. Hall's breach of contract. Further, based upon the record, we find the district court had a reasonable basis to award those damages in an amount equal to one half of the contingency fee.

## MOTION FOR NEW TRIAL

Mr. Hall also seeks review of the district court's November 9, 2023 judgment, which denied his motion for new trial. The issue he raises before this Court is that the district court failed to address LRPC 1.5(e) in its May 19, 2023 judgment with reasons. Because we consider that rule in this opinion and find it inapplicable to the facts of this case, we pretermit any further discussion of the issue.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

**AFFIRMED**